# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 3, 2012

No. 10-40835

Lyle W. Cayce
Clerk

CARRIE RAHAT SAMA,

Plaintiff–Appellant,

v.

DOCTOR EDWARD HANNIGAN; DOCTOR LANNETTE LINTHIGUM;
WILSON DEE, Director Texas Correctional Officer on Offenders Medical
Condition; DOCTOR UVALDE; DOCTOR SNYDER; DOCTOR BENOIT;
DOCTOR DEN; DOCTOR MIDDLETON,

Defendants–Appellees.

Appeals from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, OWEN, and HAYNES, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Carrie Rahat Sama, who was incarcerated in the custody of the Texas
Department of Criminal Justice–Correctional Institutions Division (TDCJ–CID),
sought damages under 48 U.S.C. § 1983. She asserted that her constitutional
rights were violated when her ovary and lymph nodes were removed without her
consent during a radical hysterectomy. The district court granted summary
judgment in favor of the physicians who performed the surgery, holding they
were entitled to qualified immunity. The district court also denied Sama's

No. 10-40835

motion to recuse, submitted to the court after she filed her notice of appeal. We affirm the district court's judgment.

## I

Sama (TDCJ # 1362948) was incarcerated in the TDCJ–CID at the Lane Murray Unit in Gatesville when she was diagnosed with a form of cervical cancer known as endocervical adenocarcinoma *in situ*, CIN III (Cervical Intraepithelial Neoplasia), a malignant condition that is thought not to have spread beyond the most superficial layer of the cells in the cervix. She was referred to the Benign GYN Service at the University of Texas Medical Branch (UTMB) and underwent a cervical conization, a surgical procedure, which revealed a more extensive cancer than had initially been suspected. In discussing the treatment plan with UTMB physicians, Sama, who was then thirty-six years of age, provided her medical history. The notes of her medical history indicate that she told UTMB personnel that she had previously had biological children through a surrogate and that she did not want her left ovary removed if a hysterectomy was warranted. She desired to preserve the possibility of conceiving again.

Sama was referred to the GYN Tumor Service, at which time Dr. Edward Hannigan, the Gynecologic Oncology Fellowship Program Director for the Department of Obstetrics & Gynecology at UTMB, became involved in her case. A resident physician under Dr. Hannigan's supervision evaluated Sama, and the assessment was malignant neoplasm of the endocervix. It is undisputed that the appropriate treatment for her malignant tumor was a radical hysterectomy.

During a pre-operative consultation, a resident physician and the attending faculty physician discussed with Sama the planned procedure, risks, and benefits. Lymph node dissection, which is part of the treatment of cervical cancer and is necessary for pathological evaluation, was included in the treatment plan. During the consultation, Sama recounted that she had

previously had eight abdominal surgeries for lysis of adhesions, which is the removal of scarring, and two years earlier, her right ovary had been removed. She also reiterated her desire to conserve her remaining ovary for future fertility. The physicians agreed they would attempt to do so, but according to the outpatient clinic note, Sama "underst[ood] that if [the ovary] is grossly abnormal" or "if anatomic constraints limit[] the ability to save her ovary," it would be removed.

On the date of the surgery, prior to the operation, Sama was further counseled by Dr. Michelle Benoit and another physician. The pre-operative notes again indicate that Sama expressed understanding that the likelihood of preserving the ovary was low. Benoit and Hannigan also stated in their affidavits that it was fully discussed with, and understood by, Sama that preservation of the ovary would be an intra-operative decision based on findings during surgery.

Sama does not dispute that she consented to a radical hysterectomy. She maintains, however, in a declaration submitted in support of her summary judgment response, that she made it clear "with each and every one of the team of [physicians]" that she would not consent to the removal of her ovary.

Sama signed a consent form authorizing the following procedures: "Radical hysterectomy and any other indicated procedures, lymph node dissection." Sama also initialed Item 7 on a List of Risks incorporated into the form, which provides in pertinent part: "I (we) understand that a hysterectomy is a removal of the uterus through an incision in the lower abdomen or vagina. I also understand that additional surgery may be necessary to remove or [re]pair other organs, including an ovary, tube, appendix, bladder, [re]ctum, vagina or ureter." Items 7A and 8 were marked (presumably as relevant to Sama's surgery), but were not initialed by Sama. Those items advised of additional risks, including sterility associated with a total abdominal hysterectomy and with fallopian tube and

ovarian surgery.  According to Sama, she refused to initial these items because she "would not sign any permits that allowed the removal of my ovary."  The procedures to be performed were handwritten on blank lines in the form, and Sama contends they were added to the form after she signed it.

Benoit, a resident surgeon, performed the surgery, and Hannigan was present throughout the procedure as the attending faculty physician.  The surgery was difficult and lengthy because of "significant and dense adhesions" from Sama's prior surgeries.  The physicians observed that the left ovary was grossly abnormal with multiple cysts, and it had adhered to surrounding structures in Sama's abdominal cavity.  The surgeons were concerned with the risk of malignancy in the abnormal-appearing ovary and also determined that removal of the ovary was necessary "to get to the lymph node basin and perform the parametrectomy (radical portion of the hysterectomy)."  Benoit and Hannigan concluded that the ovary was non-functional and that its removal was medically necessary and in Sama's best, long-term interest.  The ovary was removed.

The surgical pathology report revealed no evidence of persistent local disease or metastatic cancer.  The report did reflect an abnormality of the left ovary—hemorrhagic corpus luteum—and although Hannigan could not "state conclusively that Ms. Sama's ovary did not remain hormonally active, with the ability to produce eggs," he could state, "with reasonable medical certainty, that because of the dense fibrosis and adhesions, it is very unlikely that any egg harvesting could ever be performed."

During a second follow-up appointment four months after the surgery, Sama complained for the first time of leg weakness that had persisted since the surgery.  She claims this condition was caused by the removal of the lymph nodes during surgery.  Hannigan stated that any transient nerve damage resulting from the procedure would have been apparent immediately, and none

No. 10-40835

was noted. In addition, the treating physician at the follow-up appointment concluded the symptoms likely were not related to any operative or post-operative causes. Sama stated in her declaration that a physician has since told her the neuropathy was likely due to removal of her lymph nodes. She has presented no other evidence of causation, such as an affidavit or report from a medical professional.

Sama sued Benoit, Hannigan, and several other physicians and officials under 42 U.S.C. §§ 1983 and 1985 for violating, and conspiring to violate, her constitutional rights under the Eighth and Fourteenth Amendments. She alleged the removal of her ovary without her consent violated her right to refuse unwanted medical treatment and that the defendants were deliberately indifferent to her serious medical needs. The district court granted Benoit and Hannigan's motion for summary judgment and dismissed the case with prejudice, holding Sama had failed to rebut the physicians' assertion of qualified immunity by showing the existence of a disputed fact issue material to determining whether the physicians were deliberately indifferent under the Eighth Amendment. The district court did not address Sama's claim of a separate Fourteenth Amendment violation involving her right to refuse unwanted medical treatment.

## II

As an initial matter, we note that, in addition to Benoit and Hannigan, Sama named six other defendants in her complaint. As part of its screening of the case under 28 U.S.C. § 1915A, the district court did not order that these six defendants be served with process or respond to the complaint.[1] Thus, the

---

[1] *In re Jacobs*, 213 F.3d 289, 290 (5th Cir. 2000) ("We have long recognized the authority of the district courts to ascertain the potential frivolousness of IFP suits before directing service of process, and this authority has been codified by the PLRA." (internal citation omitted)).

district court implicitly held that no cognizable claims existed against these defendants.[2] In her brief on appeal, Sama names these other defendants as parties and appears to assume that they continue to be a part of this action. However, Sama has neither raised nor argued any issue on appeal regarding the propriety of the district court's § 1915A order as to these defendants and accordingly has waived any such issue.[3]

## III

Sama contends the district judge should have recused himself from this case because he "has a known bias on women[']s issues." Sama first raised this issue in one of two post-judgment motions filed in the district court after she appealed the judgment. The district court determined that it lacked jurisdiction to rule on the motions and held that, to the extent it had jurisdiction over Sama's recusal motion, it was untimely and without merit. Sama did not file a separate notice of appeal from that order, and we accordingly lack jurisdiction to review it.[4]

## IV

We may dispose of two of Sama's claims on waiver grounds. In her complaint, she alleged that Benoit's and Hannigan's conduct violated her equal protection rights under the Fifth and Fourteenth Amendments. However, she failed to present any argument or authority in support of this claim on appeal. Accordingly, the issue is waived.[5]

---

[2] *See* 28 U.S.C. § 1915A(b).

[3] *Brinkmann v. Dallas Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987).

[4] *Williams v. Chater*, 87 F.3d 702, 705 (5th Cir. 1996).

[5] *United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000) ("It has long been the rule in this circuit that any issues not briefed on appeal are waived.").

No. 10-40835

Sama also argues on appeal that, as a result of the surgery, she is now disabled as that term is defined in the Americans with Disabilities Act (ADA).[6] Sama did not assert an ADA claim in the district court and may not do so for the first time on appeal.[7]  Accordingly, the claim will not be considered.

## V

Sama contends that the district court erred in failing to hold a hearing on the motion for summary judgment.  District courts are not required to hold an oral hearing on a summary judgment motion,[8] and in any event, there is no indication in the record that Sama requested one.

Sama also complains that dismissal was too severe a sanction and that a less restrictive measure would have been proper.  However, the district court did not dismiss the case as a sanction.  The district court dismissed the case because of its determination that the defendants were entitled to qualified immunity based on the summary judgment evidence presented.

## VI

With regard to Sama's claim that Benoit and Hannigan violated her Eighth Amendment right to receive adequate medical care, the district court held that Sama failed to show the existence of a disputed material fact issue as to whether Benoit and Hannigan were deliberately indifferent to her serious medical needs and therefore failed to rebut their affirmative defense of qualified immunity.  We agree.

"A prison official violates the Eighth Amendment's prohibition against cruel and unusual punishment when his conduct demonstrates deliberate

---

[6] 42 U.S.C. § 12102.

[7] *See Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999).

[8] *Jackson v. Widnall*, 99 F.3d 710, 713 (5th Cir. 1996) (analyzing prior version of FED. R. CIV. P. 56).

No. 10-40835

indifference to a prisoner's serious medical needs, constituting an 'unnecessary and wanton infliction of pain.'"[9]   We have held that unsuccessful medical treatment and acts of negligence or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with her medical treatment, absent exceptional circumstances.[10]   Rather, a prison inmate can demonstrate an Eighth Amendment violation by showing that "prison officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'"[11]

Sama essentially contends the surgery was unnecessary, as the pathology reports revealed that the removed ovary and lymph nodes were not cancerous, and that she now suffers from continued leg weakness resulting from the removal of her lymph nodes.  At best, this constitutes a disagreement with her treatment and a claim of medical malpractice.  It is undisputed that Sama was timely examined, diagnosed, and treated.  The physicians involved in Sama's care exercised their reasoned medical judgment and determined that surgery was the appropriate course of treatment based on their examinations, the test results, and Sama's diagnosis.  There is no evidence that Benoit and Hannigan were deliberately indifferent to Sama's serious medical needs, and they are entitled to qualified immunity on Sama's Eighth Amendment claim.

## VII

Sama also asserts that Hannigan and Benoit violated her Fourteenth Amendment rights by removing her ovary and lymph nodes without her consent.

---

[9] *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

[10] *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

[11] *Id.* (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)) (internal quotation marks omitted).

No. 10-40835

Unlike her Eighth Amendment claim of deliberate indifference to her serious medical needs, this claim asserts a violation of substantive due process as guaranteed by the Due Process Clause of the Fourteenth Amendment,[12] under which a competent person has a liberty interest in refusing unwanted medical treatment.[13] The Supreme Court explained in *Cruzan v. Director, Missouri Department of Health* that determining "'whether [Fourteenth Amendment] rights have been violated must be determined by balancing [a claimant's] liberty interests against the relevant state interests.'"[14]

Qualified immunity generally shields government officials performing discretionary functions, such as the administration of medical care, "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[15] Once raised, the burden shifts to the plaintiff, who may rebut entitlement to immunity by demonstrating that "the official's allegedly wrongful conduct violated clearly established law."[16]

---

[12] *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (noting that the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests").

[13] *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions."); *Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment"); *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 462 n.10 (5th Cir. 2001) ("There is no question that a competent person has a liberty interest in refusing unwanted medical treatment." (internal quotation marks and ellipsis omitted)).

[14] 497 U.S. at 279 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)).

[15] *Easter v. Powell*, 467 F.3d 459, 462 (5th Cir. 2006) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Hall v. Thomas*, 190 F.3d 693, 696 (5th Cir. 1999) (noting that the administration of medical care is a discretionary function).

[16] *Kovacic v. Villarreal*, 628 F.3d 209, 211-12 (5th Cir. 2010) (internal quotation marks omitted).

No. 10-40835

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[17]  "[P]re-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what [the] defendant is doing violates federal law *in the circumstances*."[18]

In their motion for summary judgment, Hannigan and Benoit argued they were entitled to qualified immunity from all of Sama's claims.[19]  In her response to the motion, Sama pointed to evidence (in the form of her declaration and the partially initialed consent form) that she had refused to consent to the removal of her ovary under any circumstances and argued, citing *Cruzan*, that the defendants' actions violated her "constitutionally protected liberty interest in refusing unwanted medical treatment."

Exercising our discretion under *Pearson v. Callahan*, we may analyze and resolve this issue under the "clearly established" prong of the qualified immunity test.[20]  Because Sama did not meet her burden of demonstrating Benoit's and Hannigan's conduct was not objectively reasonable in light of clearly established law, the district court did not err in dismissing the case.  Raising a fact issue as to whether she consented to removal of her ovary did not suffice to meet her burden regarding clearly established law.

---

[17] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[18] *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 578-79 (5th Cir. 2009) (internal quotation marks omitted).

[19] Their motion for summary judgment asserted that "[t]he bifurcated test for qualified immunity requires examination of (a) whether the plaintiff has alleged a violation of a clearly established constitutional right; and (b) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident."

[20] *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Pasco*, 566 F.3d at 579.

No. 10-40835

As noted above, in *Cruzan*, the Supreme Court addressed the scope of a person's liberty interest in refusing unwanted treatment. The Court explained, "[D]etermining that a person has a 'liberty interest' under the Due Process Clause [in refusing unwanted treatment] does not end the inquiry; 'whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests.'"[21]  In the prison context, such countervailing state interests include providing appropriate, necessary medical treatment to inmates as well as prison safety and security.[22]

Unlike her conclusional assertions about whether she consented to removal of her lymph nodes,[23] Sama declares that she affirmatively and unequivocally told the physicians involved in her treatment that she would not consent to removal of her ovary because she hoped to someday harvest her eggs, and she refused to initial the portion of the consent form explaining risks associated with ovarian surgery.  We accept these assertions as true in our review of the summary judgment, however, it is undisputed that Sama consented to a radical hysterectomy after being advised that removal of the ovary might be necessary if anatomical constraints limited the physicians' ability to leave the ovary in place and that this determination would have to be made during the surgery.  In spite of this knowledge, Sama did not withdraw her consent to the radical hysterectomy. She proceeded.  Her refusal to give express consent to the removal of her ovary was not unequivocal.  It was ambiguous in

---

[21] *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990) (footnote omitted) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)).

[22] *Washington v. Harper*, 494 U.S. 210, 222, 236 (1990) (noting that the extent of a prisoner's rights in refusing unwanted treatment "must be defined in the context of the inmate's confinement" and upholding a state regulation permitting prison officials to forcibly medicate a mentally ill prisoner "to reduce the danger that an inmate suffering from a serious mental disorder represents to himself or others").

[23] *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004) (conclusional allegations and unsubstantiated assertions do not create a fact issue).

light of her simultaneous consent to a radical hysterectomy with the attendant uncertainties. Benoit's affidavit states that during surgery it was determined that the ovary had to be removed in order to reach and remove anatomic structures necessary to the performance of the radical portion of the hysterectomy. This is uncontroverted. We therefore are presented with a situation in which an inmate-patient has consented to a procedure while maintaining that she did not and would not consent to a necessary part of that procedure. Sama has not established that the completion of the radical hysterectomy under such circumstances violated clearly established law. The right to refuse medical treatment is not unqualified.[24] The lines separating when a state actor may and may not constitutionally administer unwanted medical treatment are far from clear.

We also note that, as a factual matter, her alleged nonconsent to the removal of her ovary was qualified by her purpose for withholding consent, which was to attempt to harvest eggs at some point in the future; it was not a binary "yes" or "no." When, during surgery, the physicians observed the scar tissue, cysts, and abnormality of Sama's ovary, they relied on their medical judgment to conclude that the ovary was nonfunctional. The dissent focuses on the fact that the pathology report found no malignancy in the ovary and that the physicians could not state conclusively that the ovary could not have produced eggs. But this overlooks the more salient fact that during the surgery the physicians saw "dense fibrosis and adhesions" and determined that because of these conditions, "it [was] very unlikely that any egg harvesting could ever be performed." Sama's condition in this regard is undisputed, and the surgeon's medical judgment and conclusion about the feasibility of harvesting an egg in the future is unchallenged. The physicians did nothing to foreclose Sama's

---

[24] *See Harper*, 494 U.S. at 221-23, 236.

ability to have a biological child: Sama's pre-existing condition prevented her from having a biological child. The reason that Sama gave for her desire to retain her ovary no longer obtained. The physicians' removal of Sama's ovary was arguably within her grant of consent in light of this circumstance. At the least, this leaves the general principle that an inmate may refuse medical treatment sufficiently uncertain in application to trigger qualified immunity.

There is an additional overlay. The ovary's continued presence in Sama's body was, in the physicians' judgment, life-threatening. The affidavit of one of the physicians states that the abnormal appearance of the ovary "raised the possibility of metastic disease in the ovary, which could not be ruled out until the final Pathology report was obtained." This exercise of professional judgement signified that, at that point, the physicians were not frustrating her consent. Although her declaration in support of her response to the motion for summary judgment states that she told the surgeons that she did not want her ovary removed under any circumstance, such a statement was not the equivalent of stating that she would rather die than have an ovary removed, as the dissenting opinion suggests. She assented to a radical hysterectomy that she knew might well entail removal of her ovary. She did not express any desire to allow cancer to take its course and end her life. To the contrary, based on what she communicated to those treating her at the time, her lack of consent was grounded in her desire to live and conceive through a surrogate. Her expressed desire was not frustrated by the physicians' considered medical judgment. This is not the stuff of a substantive due process violation. No juror could find on this record anything more than negligence on behalf of the physicians, and negligence is categorically insufficient to deprive someone of substantive due process protection.[25]

---

[25] *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) ("[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.").

No. 10-40835

In light of all of these circumstances, we cannot say that the law is, or was at the time of the defendants' conduct, clearly established such that a reasonable official in Benoit's and Hannigan's position would understand that their conduct violated Sama's Fourteenth Amendment due process rights. Sama had the burden to negate qualified immunity. Accepting her assertions as true, and considering the other undisputed facts in the record before us, Sama has not cited, and we have not located, a Supreme Court or circuit court decision holding that a violation occurred under similar circumstances,[26] in which an inmate had consented to at least part of the treatment provided, the additional treatment was deemed medically necessary as well as necessary to complete the consented-to procedure that was underway, and the attending physicians determined that it would be potentially life-threatening to end the surgery without removing the ovary and completing the radical hysterectomy. The few circuit and district court cases involving somewhat similar factual situations provide support for the position that an inmate's liberty interest in such circumstances is outweighed by the state's interests and that a reasonable person in the defendants' position could not have believed his actions violated the Fourteenth Amendment.[27] At

---

[26] *See McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (en banc) (holding that a right may be clearly established based on controlling authority—Supreme Court or Fifth Circuit case law—or "'*a consensus of cases of persuasive authority*'" in other circuits (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999))).

[27] *See Lyons v. Traquina*, No. CV 06-2339 RT, 2010 WL 3069336, at *10 (E.D. Cal. Aug. 4, 2010) (holding that an inmate's Fourteenth Amendment rights were not violated when the inmate consented to shoulder surgery and the doctor performed procedures on the shoulder that were deemed medically necessary, despite the inmate's claim that the specific procedures performed differed from those to which he had consented); *see also Brown v. Ionescu*, No. 02 Civ. 1218LMM, 2004 WL 2101962, at *5 (S.D.N.Y. Sept. 21, 2004) (finding fact issues existed as to whether an inmate consented to placement of a third stent and that, because there was no evidence indicating the necessity or urgency of the stent, summary judgment on the inmate's Fourteenth Amendment claim was inappropriate); *cf. Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992) (rejecting constitutional claim against prison regulations authorizing medical officers to force-feed an inmate if they determined his life or permanent health was in danger).

least one court has recognized the untenable position of physicians in the defendants' position, noting that if they had failed to perform other necessary procedures while the surgery was underway, they "could have subjected [themselves] to another deliberate indifference claim."[28]

With great respect, the dissenting opinion misunderstands the law of qualified immunity. The dissenting opinion suggests that we remand this case to the district court so that it may "address any necessary balancing between the prisoner's liberty interests and any state interests in providing appropriate medical treatment."[29] The opinion then asserts, "[c]ertainly it cannot be said on this record as a matter of law that the state's interest in providing treatment for a non-emergency condition outweighs Sama's" Fourteenth Amendment right to refuse medical treatment. We are not presented with a proceeding in which Sama is seeking to prevent the State from going forward with treatment against her will. We are looking in hindsight at physicians' actions to determine if the law was so clearly established in this area that it "compel[s] . . . the conclusion for every like-situated, reasonable government agent that what [the] defendant [was] doing violate[d] federal law *in the circumstances*."[30] This is a question of law and one which this court routinely answers in qualified immunity cases, even if the district court did not reach it. It was Sama's burden to negate the applicability of qualified immunity. She did not satisfy that burden.

The dissenting opinion asserts that Sama was not "required to imagine every possible argument a defendant could make—especially, such an unfathomable argument as that doctors can act at will and contrary to a

---

[28] *Lyons*, 2010 WL 3069336, at *9.

[29] *Infra* at 19 n.3.

[30] *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 578-79 (5th Cir. 2009) (internal quotation marks omitted).

patient's consent—and counter it."[31]  We do not agree that this opinion or the physicians have posited that Sama's physicians could "act at will and contrary to a patient's consent."   But irrespective of how the facts before us are characterized, Sama bore the burden regarding clearly established law.  Sama controverted some, but not all, of the facts set forth in the surgeons' affidavits. She was required to demonstrate that the defendants violated clearly established law when applied to all the salient facts—both the facts as she claimed them to be and the other *undisputed* facts.  Those facts include not only Sama's assertion that she did not consent to the removal of her ovary or lymph nodes, but also the fact that she did consent to a radical hysterectomy, the undisputed facts regarding what she was told about the nature of that surgery, and the undisputed facts regarding her condition.  Sama did not meet the burden imposed upon her under the law of qualified immunity in her response to the motion for summary judgment.

In sum, the law governing Fourteenth Amendment claims involving unwanted medical treatment in the prison context is far from certain.  Given the dearth of case law and the existence of at least some case law supporting the position that Hannigan's and Benoit's conduct was not contrary to clearly established law, Sama has failed to rebut the defendants' entitlement to qualified immunity on her Fourteenth Amendment claim, and summary judgment was appropriate.

*     *     *

For the foregoing reasons, the district court's judgment is AFFIRMED.

---

[31] *Infra* at 17.

No. 10-40835

HAYNES, Circuit Judge, concurring and dissenting:

I concur in the majority opinion's disposition of this appeal with the exception of Section VII, addressing the claim under the Fourteenth Amendment, as to which I respectfully dissent.

Initially, on procedural grounds, I disagree with reaching the Fourteenth Amendment issue at all on this appeal. Although the doctors asserted qualified immunity in a general sense to Sama's lawsuit below in their motion for summary judgment, they, as well as the district court, failed to address Sama's Fourteenth Amendment issue, focusing instead on Sama's Eighth Amendment issue.[1] Thus, rather than addressing Sama's Fourteenth Amendment issue for the first time on appeal, we should remand to allow the district court to examine it in the first instance. Although I recognize that once a defendant asserts a qualified immunity defense the burden shifts to the plaintiff to rebut it, *Kovacic v. Villarreal*, 628 F.3d 209, 211-12 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 2995 (2011), I disagree procedurally that a plaintiff (particularly, a *pro se* prisoner) is required to imagine every possible argument a defendant could make—especially, such an unfathomable argument as that doctors can act at will and contrary to a patient's consent—and counter it.

As the majority opinion acknowledges, under the substantive due process clause of the Fourteenth Amendment, a competent person has a liberty interest in refusing unwanted medical treatment. *See Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (finding that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical

_____

[1] Indeed, the doctors only discussed the standards for an Eighth Amendment claim regarding denial of medical treatment in their motion for summary judgment and similarly, only addressed her Eighth Amendment claim in their reply to Sama's response to their motion for summary judgment. Quite notably, even Sama herself, in her surreply, pointed out that the doctors had only addressed her Eighth Amendment claim and not her Fifth and Fourteenth Amendment claims, and yet, the district court, like the doctors, only addressed her Eighth Amendment claim in its memorandum and order of dismissal.

17

treatment"); *Washington v. Harper*, 494 U.S. 210, 221-22 (1990); *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 462 n.10 (5th Cir. 2001) ("There is no question that a competent person has a liberty interest in refusing unwanted medical treatment.") (internal quotation marks, ellipsis, and citation omitted). Sama's complaint alleged that she refused to consent to the removal of her ovary under any circumstances and complained of several alleged constitutional violations, including violations of the Fifth, Eighth, and Fourteenth Amendments. She further alleged that "[t]he wrongful removal of her ovary without her consent and in violation of the agreed upon treatment plan [constituted a] violation of her civil and constitutional rights[] to refuse non-court ordered treatments." In her response to the doctors' summary judgment motion, Sama cited *Cruzan* and argued that she had a constitutional liberty interest in refusing unwanted medical treatment as well as the right to die if she so desired. Indeed, contrary to the majority opinion's assertion at pages 15-16, Sama fervently argued in her response that she was willing to "risk death by the leaving of an ovary that might have to be later removed due to malignancy, in order to have her own child," and further argued in her surreply that she "had a right to refuse those parts of the treatment, even if it meant choosing the right to die."

Neither the motion for summary judgment nor the district court's order granting that motion addressed Sama's claim that the doctors disregarded her lack of consent to the removal of her ovary and thereby violated her Fourteenth Amendment due process rights. Indeed, the doctors have *never* argued that they could remove her ovary without consent. To the contrary, instead of arguing that they did not need Sama's consent, the doctors consistently argued in the district court (and here[2]) that "they had a good faith belief that Sama understood

---

[2] Their argument on this point, after acknowledging *Cruzan*, was the following: "[T]here have been no cases where this Court or the Supreme Court have found that a doctor has violated a patient's right to refuse medical treatment where the evidence overwhelmingly

No. 10-40835

the probability of ovary removal and consented to the doctors' intra-operative judgment." In other words, the doctors' position has always been that they, in fact, had Sama's consent to the removal of her one remaining ovary. As a result, nothing in the summary judgment motion would have put Sama on notice that she must imagine an argument not made and rebut it.

The district court did not address the Fourteenth Amendment claim at all, analyzing Sama's claims only under the Eighth Amendment deliberate indifference standard. Accordingly, I conclude on procedural grounds that we should remand the case to the district court with regard to Sama's Fourteenth Amendment claim.[3]

The majority opinion concludes that "[b]ecause Sama did not meet her burden of demonstrating Benoit's and Hannigan's conduct was not objectively

---

shows that the doctor performed the allegedly unwanted procedure with the good faith belief that the patient consented to it, and when it was undisputedly in the patient's best interest."

[3] On remand, the district court could address any necessary balancing between the prisoner's liberty interests and any state interests in providing appropriate medical treatment. Certainly it cannot be said on this record as a matter of law that the state's interest in providing treatment for a non-emergency condition outweighs Sama's interest in preserving whatever possibility she may have of conceiving a biological child. This is not to say that had there been a claimed emergency or necessity, the outcome would be different. Indeed, as discussed in *Cruzan*, a competent person has the right to refuse even lifesaving medical treatment. 494 U.S. at 278-87.

Furthermore, the majority opinion states that the assertion in Dr. Benoit's affidavit that "it was determined that the ovary had to be removed in order to reach and remove anatomic structures necessary to the performance of the radical portion of the hysterectomy" is uncontroverted. Maj. Op. at 12. However, review of the record shows that there was no medical emergency or necessity requiring removal of the ovary. Indeed, even the affidavit of Dr. Hannigan, Dr. Benoit's attending faculty surgeon, calls into question the claim that the ovary absolutely had to be removed for any reason: "[i]t was our opinion that there was no grossly viable - normal ovarian tissue, that the ovary was non-functional, and, therefore, the ovary was removed. . . . It was our reasoned medical judgment that the best long-term outcome for the patient would be removal of the ovary at the time of this procedure. It was in the patient's best interest to remove the ovary." Moreover, Dr. Hannigan, despite the incentive to state otherwise, never asserts that removal of the ovary was necessary to complete the radical portion of the hysterectomy. Thus, not only was removal of the ovary not the result of some life-threatening emergency or imminent situation, but also the suggested necessity of removal is indeed in doubt.

19

reasonable in light of clearly established law, the district court did not err in dismissing the case." Maj. Op. at 10. Furthermore, although the majority opinion acknowledges a clear constitutional right for a prisoner to refuse medical treatment, it finds that the doctors are entitled to qualified immunity for the unauthorized removal of Sama's ovary because Sama had arguably authorized[4] a "radical" hysterectomy and because the doctors' intra-operative observation of the ovary suggested that the ovary was nonfunctional. Maj. Op. at 11-13. Furthermore, the majority opinion contends that the doctors would not have been on notice that they were violating clearly established law because there is not another case like this one. Maj. Op. at 14.

That there be another case exactly like this one is not required to deny qualified immunity. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Moreover, although we should certainly be relieved that there is not another case exactly like this one, even the very precedents cited in the majority opinion clearly establish that a prisoner-patient has the right to refuse treatment. Maj. Op. at 10 n.18. Given that body of law, it is difficult to see how it is "objectively reasonable" to think that one is not violating the rights of a patient as adamant as Sama claims she was about what she did and did not authorize.

Indeed, even the doctors themselves have not made the argument utilized by the majority opinion. The doctors, perhaps in consideration of their own medical ethics[5] and professional reputations, never said they could countermand

---

[4] Sama contends that the handwritten language "radical hysterectomy and any other indicated procedure, lymph node dissection" was not there when she signed the consent form.

[5]        The characteristic that distinguishes a profession, such as medicine, from a trade, such as repairing automobiles, is that the

No. 10-40835

their patient's expressed wishes and remove the ovary over her objection. *See Murphy v. Russell*, 167 S.W.3d 835, 838 (Tex. 2005) ("Medical treatment will not constitute a battery unless it is provided without the patient's consent."); *Miller v. HCA, Inc.*, 118 S.W.3d 758, 767 (Tex. 2003) ("[T]he general rule in Texas is that a physician who provides treatment without consent commits a battery."). No doubt, the doctors are well aware that "all fallopian tube and ovarian surgery with or without hysterectomy, including removal and lysis of adhesions," is a List A procedure as dictated by the Texas Medical Disclosure Panel and thus, disclosure and consent to ovarian surgery are specifically required by Texas statute. TEX. CIV. PRAC. & REM. CODE ANN. § 74.101, *et seq.* (West 2011); 25 TEX. ADMIN. CODE §§ 601.1, 601.2(g)(3) (2011).

The doctors thus have not, could not, and indeed, dared not, argue that a doctor providing treatment to a prisoner-patient is free to roam about the prisoner-patient's body during surgery, exercising his "medical judgment" against the expressed wishes of the prisoner-patient. Instead, they argued that

---

members establish and maintain standards of training, competence, and professional behavior. These standards are enforced by professional organizations, such as the American Medical Association, which has a Council on Ethical and Judicial Affairs.

Traditionally, medical ethics covers a wide range of behavior, including the physician's involvement with patients and their families, and his or her competence, public image, and commercial behavior.

Physicians must not abuse the relationship of trust they develop with patients. . . . They must give clear priority to their patients' interests.

. . . .

The physician should ensure that the patient not only consents to all procedures, investigations, and treatments, but that this consent is based on an unbiased and full explanation of any risks, drawbacks, and alternatives that might be considered.

THE AMERICAN MEDICAL ASSOCIATION, ENCYCLOPEDIA OF MEDICINE 422 (Charles B. Clayman, MD ed., 1989).

21

she consented (or that they had a good faith belief that she did), a point as to which the majority opinion concedes (or at least accepts for argument's sake) there is a fact issue. With that said, it is bewildering that such bedrock principles of medical ethics and legal-medico jurisprudence that there be consent to treatment and respect for a patient's right to choose his course of treatment are effectively deemed not clearly established law by operation of the majority opinion. *See Tex. Med. Providers Performing Abortion Servs. v. Lakey*, No. 11-50814, 2012 WL 45413, at *13 (5th Cir. Jan. 10, 2012) (Higginbotham, J., concurring) ("The doctor-patient relationship has long been conducted within the constraints of informed consent to the risks of medical procedures, as demanded by the common law, legislation, and professional norms. The doctrine itself rests on settled principles of personal autonomy, protected by a reticulated pattern of tort law, overlaid by both self- and state-imposed regulation."); *Wall v. Brim*, 138 F.2d 478, 481 (5th Cir. 1943) ("The law is well settled that an operation cannot be performed without the patient's consent and that one performed without consent, express or implied, is a technical battery or trespass for which the operator is liable. . . . The same principle . . . also supports the holding that a surgeon may not perform an operation different in kind from that consented to or one involving risks and results not contemplated." (footnotes omitted)).[6]

A *pro se* plaintiff's pleadings are to be construed liberally with all well-pleaded allegations taken as true. *Perez v. United States*, 312 F.3d 191, 194-95 (5th Cir. 2002) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that allegations in a *pro se* complaint are to be held "to less stringent standards than

---

[6] I certainly recognize that § 1983 is not a means to federalize state tort law, and I do not suggest that the doctors can or should be held liable here merely for violations of Texas law. I cite to these cases, statutes, and standards because they inform the analysis of what clearly established law shows the right to refuse consent means and whether it could be objectively reasonable for the doctors to think they could act contrary to the prisoner-patient's refusal under the facts as Sama alleges them to be.

22

No. 10-40835

formal pleadings drafted by lawyers")); *Johnson v. Atkins*, 999 F.2d 99, 100 (5th Cir. 1993) (citing *Brinkmann v. Johnston*, 793 F.2d 111, 112 (5th Cir. 1986)).  In addition, on summary judgment, "all evidence produced by the nonmovant is taken as true and all inferences are drawn in the nonmovant's favor."  *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 349 (5th Cir. 2001).

Applying those standards, Sama's evidence, as the majority opinion notes, is that she vociferously and clearly stated that she did not want her ovary removed because she fiercely desired at least the chance to have a biological child born through a surrogate.[7]  She averred that she stated this at every turn to every medical professional along the chain of professionals she encountered—"[w]ith each and every one of the team of [doctors,] I made it clear that I would not sign any permits that allowed the removal of my ovary." Indeed, she purposely refused to initial the section of the disclosure forms that would permit removal of the ovary even if deemed medically necessary—"I was given no fewer than three lymph node and ovary removal permits and I would not sign them because I would not consent to the removal of my ovary under any circumstances."  Thus, she had taken every step she could possibly take to make her lack of consent to ovary removal known.  She then trusted in the doctors to follow her wishes while she was unconscious and unable to physically stop them.

Here, it is undisputed that the doctors did just the opposite of Sama's wishes and removed Sama's ovary and, thereby, extinguished her last hope of

---

[7] It is uncertain whether Sama has previously had children.  Her memorandum of law in support of her first amended complaint states that she never had any children and that prior to her incarceration, Sama and her husband had looked into the possibility of harvesting her ova for implantation in a surrogate because of her fertility problems.  However, a note in her medical records states that Sama reported having children via surrogacy before. Regardless, one fact that is resoundingly clear, even in that same medical records note, is that Sama desired to keep her remaining ovary.

conceiving her own biological child.[8]  In spite of that, the majority opinion focuses on Sama's arguable consent to a "radical" hysterectomy.  Yet even the majority opinion's own discussion shows that a "radical" hysterectomy does not necessarily entail removal of the ovary.  The majority opinion also posits that Sama's nonconsent was only limited by her purpose for ovarian conservation so that when the doctors concluded in their medical judgment that Sama's ovary was nonfunctional and possibly (ultimately, but certainly not immediately) life-threatening, they did not violate her nonconsent by removing it.  Maj. Op. at 12-13.  This argument was never made by the doctors.

The majority opinion's argument presupposes that Sama would have consented to the removal of her ovary if she had known that it was "nonfunctional" or (ultimately) "life-threatening."  These ruminations turn the summary judgment review standard on its head.  Rather than taking Sama's evidence as true, the majority opinion creates an implied consent by directly contravening Sama's position and evidence and ignoring Sama's claim that she refused consent "no matter what" and that she was willing to risk needing future surgical procedures and even death to conserve her one remaining ovary.  Moreover, a highly disturbing aspect of this case is that despite the doctors' exercise of "considered medical judgment" and their self-serving assessments that it was "unlikely that any egg harvesting could ever be performed," even the doctors themselves admitted that they could not "state conclusively that Ms. Sama's ovary did not remain active, with the ability to produce eggs." Furthermore, the pathology report on the ovary whose continued presence in

---

[8] Although it has been the focus of much of the majority opinion, removal of Sama's one remaining ovary was not simply the end to her ability to have biological children.  Instead, there are also immediate physical consequences that may seriously impact Sama—for example, the (sometimes severe) hormonal changes caused by ovary removal.  An ovary is not an appendix.

No. 10-40835

Sama's body was allegedly life-threatening in the doctors' judgment, revealed that the ovary was not cancerous.[9]

In addition, the core of the issue at bar is the liberty interest in refusing unwanted medical treatment, even life-saving medical treatment. Accordingly, the ultimate purpose for Sama's desire for ovary conservation is irrelevant if we take as true that Sama refused consent to ovary removal "under any circumstances." The majority opinion's emphasis on the viability of the ovary or the eventual threat that it may have posed to Sama's life as bringing the removal of Sama's ovary "within her grant of consent" cannot be squared with the prisoner-patient's liberty interest in refusing unwanted medical treatment.

Given Sama's clear instructions not to remove the ovary, we do not have a murky situation of a doctor having consent to perform a specific surgery but then some emergency arises necessitating some other form of surgery. *See Dunham v. Wright*, 423 F.2d 940, 941-42 (3d Cir. 1970) (calling it a "blackletter rule, clear and simple on its face," that "[l]egal-medico jurisprudence requires that a physician obtain the consent of a patient before performing surgery unless the need for such consent is obviated by an emergency which places the patient in immediate danger and makes it impractical to secure such consent"). Nor do we have any other "gray area" where the "not clearly established" jurisprudence arises. We have clear law that says a prisoner-patient has a constitutional right to say "no," we have a patient who said "no," and we have doctors who are not claiming that the law would have permitted their conduct despite this "no."

The effect of the majority opinion's conclusion today is that, once a patient consents to at least some treatment, all treatment is permissible so long as the

---

[9] I do not here quarrel with the idea that medical negligence is insufficient for § 1983 liability. Instead, I seek to counter the majority opinion's assumption that the right to refuse consent can be vitiated by the doctor's own (apparently incorrect) "medical judgment" against the will of his patient or that it would be reasonable for a doctor to think so.

doctor deems it necessary.  What, then, is left of the right to refuse treatment? At the very least, Sama should be permitted to develop this issue in the district court.  Furthermore, at this juncture, whether Sama is entitled to remand on her Fourteenth Amendment claim should not be diminished or influenced by her chances of obtaining damages at trial.

For the foregoing reasons, I respectfully dissent to Section VII of the majority opinion.