DENNIS, Circuit Judge,
joined by REAVLEY, PRADO, and GRAVES, Circuit Judges, specially concurring:
I concur in affirming the district court’s judgment permanently enjoining Farmers Branch Ordinance 2592 because federal law preempts and renders it invalid. Although I agree with many of the reasons Judge Higginson assigns in the lead opin *544 ion for reaching the same result, I believe the Ordinance is even more fundamentally flawed than he indicates.[1] In my view, the Ordinance is preempted in all of its core provisions by the comprehensive and interrelated federal legislative schemes governing the classification of noncitizens, the adjudication of immigration status, and the exclusion and deportation of noncitizens from the United States, enacted pursuant to the federal government’s constitutional authority to administer a uniform national immigration policy.[2]
I
In Arizona v. United States, — U.S. -, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012), the Supreme Court reiterated the familiar maxims that a state or local law is preempted under the Supremacy Clause not only where Congress enacts “an express preemption provision” but also where congressional “intent to displace state law altogether can be inferred from a framework of regulation ‘so pervasive ... that Congress left no room for the States to supplement it,’ ” id. at 2501 (alteration in original) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947)), or “where the challenged state law ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,’ ” id. (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). I believe the Hines Court’s earlier discussion of the overlap and interplay of these related formulations continues to provide useful guidance as to the ultimate practical inquiry under implied preemption doctrine:
There is not — and from the very nature of the problem there cannot be— any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress. This Court, in considering the validity of state laws in the light of treaties or federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula. Our primary function is to determine whether, under the circumstances of [a] *545 particular case, [the challenged state or local] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.
Hines, 312 U.S. at 67-68, 61 S.Ct. 399. Like my colleagues who join the lead opinion, as well as the original panel and the district court below, I conclude that the Farmers Branch Ordinance presents such an obstacle to the purposes of federal law, and therefore cannot stand.
II
In my view, this case largely is controlled by the longstanding, unremarkable principle that the federal government’s authority to exclude or remove foreign nationals, and to otherwise regulate the residence of noncitizens within the United States, is necessarily exclusive of infringement by state or local legislation. The Supreme Court made this clear more than sixty years ago:
The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. Hines [,] [312 U.S. at 66, 61 S.Ct. 399]. Under the Constitution the states are granted no such powers; they can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states.
Takahashi v. Fish & Game Comm’n, 334 U.S. 410, 419, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948).
This past year, in Arizona, the Supreme Court reaffirmed that “[t]he Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.” Arizona, 132 S.Ct. at 2498 (citing Toll v. Moreno, 458 U.S. 1, 10, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982)). “This authority rests, in part, on the National Government’s constitutional power to ‘establish an uniform Rule of Naturalization,’ U.S. Const., Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations.” Id. “Federal law makes a single sovereign responsible for maintaining a comprehensive and unified system to keep track of aliens within the Nation’s borders,” id. at 2502, and “[policies pertaining to the entry of aliens and their right to remain here are [likewise] entrusted exclusively to Congress,” id. at 2507 (quoting Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 98 L.Ed. 911 (1954)).
In exercise of this exclusively national authority, “[f]ederal governance of immigration and alien status is extensive and complex.” Id. at 2499. Of particular relevance here, “Congress has specified which aliens may be removed from the United States and the procedures for doing so.” Id. “A principal feature of the removal system” Congress has enacted “is the broad discretion exercised by immigration officials.” Id. For instance, in “the initiation or prosecution of various stages in the deportation process!,] ... the Executive has discretion to abandon the endeav- or, and ... [the Executive has] engagfed] in a regular practice (which ha[s] come to be known as ‘deferred action’) of exercising that discretion for humanitarian reasons or simply for its own convenience.” Reno v. Am.-Arab Anti-Discrim. Comm., 525 U.S. 471, 484-85, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).[3] The Court made *546 clear in Arizona that a state or local law that “violates the principle that the removal process is entrusted to the discretion of the Federal Government” cannot stand. 132 S.Ct. at 2506 (citing Am.-Arab Anti-Discrim. Comm., 525 U.S. at 483-84, 119 S.Ct. 936).
Most pertinent to the present case, the Arizona Court concluded that this comprehensive federal legislative scheme, and the significant discretion it vests in federal immigration authorities, necessarily-preempted Arizona legislation that would have allowed “a state officer, ‘without a warrant, [to] arrest a person if the officer has probable cause to believe ... [the person] has committed any public offense that makes [him] removable from the United States.” Id. at 2505 (final three alterations in original). The Court held that the statute stood as an impermissible obstacle to the design and purposes of the largely discretionary immigration enforcement system Congress created because it could result in “unnecessary harassment of some aliens (for instance, a veteran, college student, or someone assisting with a criminal investigation) whom federal officials determine should not be removed” and ultimately “would allow the State to achieve its own immigration policy.” Id. at 2506. Because such state-to-state variance “is not the system Congress created,” the Court held that the Arizona statute “violates the principle that the removal process is entrusted to the discretion of the Federal Government.” Id.
The Farmers Branch Ordinance likewise “violates the principle that the removal process is entrusted to the discretion of the Federal Government,” see id., by criminalizing the rental of residential property to certain noncitizens and thereby in effect commencing the process of excluding them from a part of “the United States or the several states,” see Takahashi, 334 U.S. at 419, 68 S.Ct. 1138; cf. Arizona, 132 S.Ct. at 2521 (Scalia, J., dissenting) (complaining that the federal government’s discretionary “enforce[ment] [of] immigration laws ... leaves the States’ borders unprotected against immigrants whom those laws would exclude” (emphasis added)). Moreover, noncitizen renters “could be unnecessarily] harass[ed]” and prosecuted under a law like that here, including individuals “whom federal officials determine should not be removed.” See Arizona, 132 S.Ct. at 2506. Underscoring the Ordinance’s fundamental inconsistency with the federal system, federal law specifically requires a noncitizen subjected to removal proceedings to provide federal authorities “with a written record of an address ... at which the alien may be contacted respecting [the] proceeding.” 8 U.S.C. § 1229(a)(1)(F)(i); cf. Arizona, 132 S.Ct. at 2505 (“As a general rule, it is not a crime for a removable alien to remain present in the United States.”).
The City argues that the Ordinance is consistent with federal immigration law because under the classification and enforcement system envisioned by the Ordinance, City officials making determinations of “lawful presence” are to rely on federal agents’ responses to queries submitted pursuant to 8 U.S.C. § 1373(c), which directs federal immigration authorities to *547 “respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law.” However, the Ordinance’s enforcement scheme turns on determinations of whether a noncitizen tenant is or is not “lawfully present in the United States,” a blunt binary classification that is inconsistent with the extensive array of immigration statuses provided under federal law and with the complex, often discretionary processes by which the federal government enforces and adjudicates immigration law. See Arizona, 132 S.Ct. at 2499 (“Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all. If removal proceedings commence, aliens may seek asylum and other discretionary relief allowing them to remain in the country or at least to leave without formal removal.” (citations omitted)); id. at 2506 (“There are significant complexities involved in enforcing federal immigration law, including the determination whether a person is removable.”).
In holding that state or local laws that effectively exclude certain noncitizens are inconsistent with the federal government’s exclusive authority to define and determine immigration status and regulate the presence of foreign nationals, the decision this court reaches today accords with the Eleventh Circuit’s post-Arizona decision in United States v. Alabama, 691 F.3d 1269 (11th Cir.2012), cert. denied, — U.S.-, 133 S.Ct. 2022, 185 L.Ed.2d 905 (2013), which preempted an Alabama statute similar in effect to the Farmers Branch Ordinance. The Alabama law purported to “prohibit[ ] courts from enforcing or recognizing contracts between a party and an unlawfully present alien,” including contracts for rental housing. Id. at 1292-93. Noting that “[t]he power to expel aliens has long been recognized as an exclusively federal power,” id. at 1293, the Eleventh Circuit held that the Alabama legislation “conflicts with Congress’s comprehensive statutory framework governing alien removal,” id. at 1294. Much as with the instant Ordinance, in that case, “Alabama ha[d] taken it upon itself to unilaterally determine that any alien unlawfully present in the United States cannot live within the state’s territory, regardless of whether the Executive Branch would exercise its discretion to permit the alien’s presence.” Id. at 1295. As the Eleventh Circuit rightly concluded, “[tjhis is not a decision for [a state or city] to make.” See id[4]
III
In many contexts, of course, our federalist system permits states to “try novel social and economic experiments without risk to the rest of the country.” New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandéis, J., dissenting). The supremacy of federal law, however, is fundamental to this federalism. Wyeth v. Levine, 555 U.S. 555, 584, 129 S.Ct. 1187, 173 L.Ed.2d 51 *548 (2009). Arizona and other preemption cases teach that the Supremacy Clause will not abide local divergence from necessarily uniform national laws and policies adopted pursuant to the federal government’s constitutional powers. Arizona, 132 S.Ct. at 2502 (“If § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations, diminishing] the [Federal Government’s control over enforcement and detracting] from the integrated scheme of regulation created by Congress.” (alterations in original) (internal quotation marks omitted) (quoting Wis. Dep’t of Indus. v. Gould Inc., 475 U.S. 282, 288-89, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986))); see Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 161-63, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (“The prospect of all 50 States establishing similar protections for preferred industries without the rigorous requirements of patentability prescribed by Congress could pose a substantial threat to the patent system’s ability to accomplish its mission of promoting progress in the useful arts.... One of the fundamental purposes behind the Patent and Copyright Clauses of the Constitution was to promote national uniformity in the realm of intellectual property.... Absent [a uniform] federal rule, each State could afford patent-like protection to particularly favored home industries, effectively insulating them from competition from outside the State.”); Wis. Dep’t of Indus., 475 U.S. at 288-289, 106 S.Ct. 1057 (“[I]f Wisconsin’s [law debarring certain repeat violators of the National Labor Relations Act (NLRA)] from doing business with the State is valid, nothing prevents other States from taking similar action against labor law violators. Indeed, at least four other States already have passed legislation disqualifying repeat or continuing offenders of the NLRA from competing for state contracts. Each additional statute incrementally diminishes the [National Labor Relations] Board’s control over enforcement of the NLRA and thus further detracts from the ‘integrated scheme of regulation’ created by Congress.” (footnote omitted)).
Uniformity of national law and policy are essential to this nation’s classification and treatment of the citizens of other nations. See Arizona, 132 S.Ct. at 2498 (“The [Federal] Governmentfs] ... broad, undoubted power over the subject of immigration and the status of aliens[ ] ... rests, in part, on the National Government’s constitutional power to ‘establish an uniform Rule of Naturalization,’ and its inherent power as sovereign to control and conduct relations with foreign nations---Immigration policy can affect trade, investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of aliens in this country who seek the full protection of its laws.” (citations omitted)); see also, e.g., Renteria-Gonzalez v. INS, 322 F.3d 804, 814 (5th Cir.2002) (emphasizing the importance of “uniformity of federal law and consistency in enforcement of the immigration laws”). As the Arizona Court explained, “[a] decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice.” 132 S.Ct. at 2506-07 (emphasis added); see also id. at 2507 (“Removal decisions[ ] ... implicate [the Nation’s] relations with foreign powers and require consideration of changing political and economic circumstances.” (third alteration in original) (quoting Jama v. Imm. & Customs Enforcement, 543 U.S. 335, 348, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005))); Renteria-Gonzalez, 322 F.3d at 814 (“[T]he executive branch[ ] ... ‘must exercise especially sensitive political functions that implicate foreign relations.’” (quoting INS v. Abudu, *549 485 U.S. 94, 110, 108 S.Ct. 904, 99 L.Ed.2d 90 (1988))).
Accordingly, perhaps more than in any other context, “[t]he prospect of all 50 States establishing” laws similar to Farmers Branch’s Ordinance “could pose a substantial threat to th[e]” uniform federal immigration “system’s ability to accomplish” its various competing and highly sensitive functions. See Bonito Boats, Inc., 489 U.S. at 161, 109 S.Ct. 971. If the Ordinance “were valid, every State could give itself independent authority to” regulate the presence of noncitizens, “diminishing the Federal Government’s control over [immigration] enforcement and detracting from the integrated scheme of regulation created by Congress.” See Arizona, 132 S.Ct. at 2502 (brackets and internal quotation marks omitted). If this law were constitutional, all cities and states could by similar laws seek to withdraw rental housing from vast numbers of noncitizens and, in effect, accomplish their removal from the United States. Much more likely, and equally problematic, is the prospect of a patchwork of “[s]tate ... immigration policies],” Arizona, 132 S.Ct. at 2506, with some states imposing additional burdens on certain noncitizens based on the states’ own classification and enforcement schemes, see, e.g., Alabama, 691 F.3d at 1292-97. Such an arrangement would be plainly incompatible with the “comprehensive and unified system” of exclusive federal immigration regulations, see Arizona, 132 S.Ct. at 2502, and with “the limitations imposed by the Supremacy Clause,” Wyeth, 555 U.S. at 584, 129 S.Ct. 1187.
Because the nation must necessarily speak “with one voice” when pronouncing “whether it is appropriate to allow a foreign national to continue living in the United States,” the Supremacy Clause does not abide local experimentation that deviates from “the system Congress created.” Arizona, 132 S.Ct. at 2506-07.
IV
In sum, I conclude that the Ordinance infringes on and conflicts with comprehensive and exclusively federal schemes for classifying noncitizens and with enforcing and adjudicating the implications of those federal classifications. It thus stands as an obstacle to the full achievement of the purposes and objectives of uniform federal immigration law. Therefore, I agree that the Ordinance is preempted under the Supremacy Clause.

. The lead opinion concludes first that the Ordinance’s criminal offense and judicial review provisions conflict with the mechanisms and purposes of federal immigration law in various respects; and then that the remaining provisions of the Ordinance are not severable from the unconstitutional provisions under applicable principles of Texas law. In my view, the Ordinance’s fundamental defects— its classification of noncitizens based on the concept of "lawful presence” and its purported regulation of the residence and presence of noncitizens based on that classification — are intrinsic to the Ordinance’s structure and run throughout its various provisions, making a severability analysis unnecessary. In any event, however, the City has forfeited and waived any argument as to the applicability or effect of the Ordinance's severability clause by declining to argue the issue below, see Nasti v. CIBA Specialty Chems. Corp., 492 F.3d 589, 595 (5th Cir.2007) (”[T]o preserve an argument for appeal, [a] litigant must press [it] ... before the district court.”), to the original panel, see Sama v. Hannigan, 669 F.3d 585, 589 n. 5 (5th Cir.2012) (”[I]ssues not briefed on appeal are waived.”), or even in its en banc petition or brief, see United States v. Hernandez-Gonzalez, 405 F.3d 260, 262 (5th Cir.2005) ("Absent extraordinary circumstances, this court will not consider issues raised for the first time in a petition for rehearing.”).

. I also agree with many of the reasons assigned by Judge Reavley in his separate opinion concurring in the judgment.

. In a notable recent exercise of this prosecutorial discretion, in June 2012 "the Secretary of Homeland Security announced a program” whereby "U.S. immigration officials have been directed to 'defe[r] action’ ” as to "some 1.4 million [noncitizen students, high school graduates, veterans, and others] under the *546 age of 30 ... who came to the United States under the age of sixteen” without authorization and meet certain other criteria. Arizona, 132 S.Ct. at 2521 (Scalia, J., dissenting) (first alteration in original) (quoting Memorandum from Janet Napolitano, Secy of Homeland Security, to David V. Aguilar, Acting Comm’r, U.S. Customs & Border Protection; Alejandro Mayorkas, Dir., U.S. Citizenship & Imm. Servs.; and John Morton, Dir., U.S. Imm. & Customs Enforcement, at I (June 15, 2012), and citing Julia Preston & John H. Cushman, Jr., Obama to Permit Young Migrants to Remain in U.S., N.Y. Times, June 16, 2012, at Al).

. Courts considering similar enactments prior to Arizona likewise held them unconstitutional. See Lozano v. City of Hazleton, 620 F.3d 170, 221 (3d Cir.2010) (holding preempted municipal housing ordinance that would "effectively ‘remove’ persons from [the city] based on a snapshot of their current immigration status, rather than based on a federal order of removal”), vacated on other grounds, — U.S. -, 131 S.Ct. 2958, 180 L.Ed.2d 243 (2011); Cent. Ala. Fair Housing Ctr. v. Magee, 835 F.Supp.2d 1165, 1183 (M.D.Ala.2011) (enjoining enforcement of since-amended Alabama law prohibiting "unlawfully present” residents from obtaining or renewing manufactured home permits because the law "runs afoul of federal policy” by "making an impermissible leap from undocumented status to removal”).