# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
January 8, 2019

Lyle W. Cayce
Clerk

No. 17-20388

MUSKET CORPORATION,

> Plaintiff - Appellant Cross-Appellee

v.

SUNCOR ENERGY (U.S.A.) MARKETING, INCORPORATED,

> Defendant - Appellee Cross-Appellant

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:15-CV-100

Before HIGGINBOTHAM, SMITH, and GRAVES, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:*

Plaintiff-Appellant Musket Corporation ("Musket") filed suit against Defendant-Appellee Suncor Energy (U.S.A.) Marketing, Inc. ("Suncor") in federal court to resolve a dispute arising from a contract for the sale and delivery of crude oil. Suncor filed counterclaims against Musket and moved to dismiss some of Musket's claims. The district court granted Suncor's motion to dismiss in part. After the close of discovery, Suncor moved for summary judgment on Musket's remaining claims. The district court granted Suncor's

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-20388

motion in part. Musket moved for summary judgment on Suncor's counterclaims. The district court granted the motion. Both parties now appeal part of the district court rulings on their respective motions.

For the reasons stated below, we AFFIRM.

## I. BACKGROUND

This case involves two major players in the U.S. crude oil market. Musket is a leading commodity supply, trading, and logistics company, and an affiliate of Love's Travel Stops and Country Stores, Inc.; the second largest diesel retailer in the United States. A substantial part of Musket's business involves shipping crude oil by rail, generally from terminals located near crude oil production sites to refineries. Suncor is a crude oil supply, marketing, and trading company based in Colorado, advertised as guaranteed by Suncor Energy, Inc.—the first company to develop oil sands[1]—which remains its largest producer.

### A. The Contractual Relationship

In July 2012, Suncor engaged Musket to become the exclusive supplier of crude oil to Musket's Windsor, Colorado terminal (the "Windsor Terminal"). Musket alleges Suncor represented that Suncor could, among other things, provide 20,000 barrels of crude oil per day to the Windsor Terminal and would be able to provide that volume regularly. Musket purportedly made infrastructure enhancements to the Windsor Terminal in anticipation of receiving 20,000 barrels of crude oil per day from Suncor. On April 1, 2013, Musket and Suncor entered into an agreement (the "Agreement") consisting of: (1) a Master Agreement for U.S. Crude Oil Purchase, Sale, or Exchange Transactions (the "Master Agreement")—pursuant to which Musket agreed to

---

[1] Found in Canada, oil sands are a natural mix of sand, water and bitumen (oil that is too heavy or thick to flow on its own). *Oil Sands*, Can. Assoc. Petroleum Producers, https://www.capp.ca/canadian-oil-and-natural-gas/oil-sands (last visited Sept. 13, 2018).

No. 17-20388

buy, and Suncor agreed to sell and deliver, crude oil; (2) the General Provisions Domestic Crude Oil Agreements (the "General Provisions"); and (3) the Physical Confirmation Transaction (the "Confirmation"), which established the quantities, delivery dates, delivery points, and price of the crude oil Suncor was to deliver to the Windsor Terminal. The Agreement was to run from April 1, 2013 to March 31, 2015.[2] As part of the Agreement, Suncor agreed to sell and deliver, and Musket agreed to buy and receive, 20,000 barrels of crude oil per day during 2014 and the first quarter[3] of 2015. New York law governs the Agreement.[4]

## B. Conflicts

Musket and Suncor's arrangement was rocky. The Agreement required Musket to provide railcars and storage capacity to receive the crude oil supplied by Suncor. Musket also agreed to expand the Windsor Terminal to ensure Musket had the capacity to receive the crude oil delivered by Suncor.

There were times when the Windsor Terminal could not receive the committed volumes[5] of crude oil as outlined in the Agreement. Musket did not accept a full committed volume during the second quarter of 2013, the third quarter of 2013, the fourth quarter of 2013, in 2014, or the first quarter of 2015. Around July 2014, Suncor suffered an interruption[6] as defined in the

---

[2] This period is referred to as the "Term" of the Agreement.

[3] A "quarter" as it is used in this context is three months in a calendar year.

[4] The parties agree New York law governs the Agreement and Section M of the Master Agreement states as much.

[5] "Committed volumes" are the number of barrels per day ("bpd") to be delivered by Suncor during the specified "period of commitment" under the terms of the Agreement.

[6] Under the terms of the Agreement, "Interruption" means:

[I]n respect of a Party or a connection carrier: (i) any shut down, turnaround, breakdown, repairs, maintenance, construction change in operations or operational issues relating to equipment, machinery, facilities, pipelines or plants; (ii), governmental regulations or orders; that may directly or indirectly affect the

Agreement.[7] The interruption was related to the Williams Overland Pass NGL pipeline (the "NGL Pipeline"). The NGL Pipeline was an essential part of the production of crude oil that Suncor needed to purchase in order to supply Musket's Windsor Terminal. Following the interruption, the wells that produced the crude oil Suncor sold to Musket at the Windsor Terminal were either slowed down or shut for some time. The interruption hampered Suncor's ability to deliver Musket crude oil in accordance with the Agreement. Suncor's oil supply was negatively affected by the interruption until November 2014.

Beginning in the spring of 2014, Suncor representatives made reassurances to Musket that Suncor had the capacity to meet the committed volumes[8] under the Agreement and would deliver those volumes to the Windsor Terminal. Those reassurances occurred throughout the spring, summer, and fall of 2014.[9]

Suncor could not meet the committed volumes. As a result, the parties modified the volumes Suncor was to deliver to Musket. Instead of committed

---

ability of a Party to fulfill its obligations under this Agreement in whole or in part, or to apportion their facilities or acceptance and/or delivery of crude oil.

[7] The Agreement contains an interruption provision, found in the Confirmation, which states:

The Parties acknowledge and agree that in the event of any Interruption or Force Majeure circumstance (as defined in the Master Agreement) lasting longer than thirty (30) days: (i) the applicable Committed Volume of Product to be delivered will be reduced on a pro rata basis; and (ii) any payment hereunder not already due and payable by the Buyer will be excused or proportionately reduced, as appropriate, for so long as the party's performance is so excused; provided that, for greater clarity, in the event of any Interruption or Force Majeure circumstance lasting for a period of less than thirty (30) days, Buyer shall continue to make payment for the Product for each day of the Interruption or Force Majeure circumstance up to thirty (30) days.

[8] For the relevant period, the committed volumes were 20,000 barrels per day.

[9] Musket alleges the reassurances occurred on March 5, 2014; March 14, 2014; June 27, 2014; July 7, 2014; September 4, 2014; September 9, 2014; September 18, 2014; and October 1, 2014.

volumes of 20,000 barrels of crude oil per day as outlined in the Agreement, the parties agreed that Suncor would deliver nominated volumes of 18,000 barrels per day in August 2014, 16,000 barrels per day in September 2014, 16,000 barrels per day in October 2014, and 15,000 barrels per day in November 2014. Suncor failed to deliver the nominated volumes.

Also during the spring of 2014, Suncor engaged Musket with discussions about, among other things, an extension of the Master Agreement and presented Musket with pipeline infrastructure plans that would facilitate Suncor's providing an increased crude oil supply to the Windsor Terminal. Suncor proposed building pipeline infrastructure connecting to the Windsor Terminal. Musket contends Suncor's proposals prevented Musket from exploring alternate crude oil suppliers. According to Musket, Suncor demanded confidentiality and indicated that any discussion with a third-party crude oil supplier would preclude the parties from establishing a long-term arrangement.

Musket asserts that Suncor used the contract extension and pipeline connection discussions to distract Musket from collecting on Suncor's payment obligations under Alternative #2[10] of the Confirmation. Suncor agreed to pay Musket $328,716 for its failure to deliver nominated volumes in August 2014— a discount on the $1.4 million Suncor was obligated to pay under the Agreement. Subsequently, Suncor failed to deliver nominated volumes in September 2014, and requested the opportunity to combine the August 2014 payment with the September 2014 payment at a discount. Seeking to maintain a relationship with Suncor, Musket agreed to the discounts. Musket contends that reliance on the infrastructure plans and the positive commercial impact those plans could produce, as well as Suncor's request to be the exclusive crude

---

[10] *See infra* Section III.B.2 for definition.

oil supplier for the Windsor Terminal, left Musket without sufficient crude oil to operate the Windsor Terminal efficiently. Musket alleges Suncor never intended to pursue a long-term extension of the Master Agreement, a pipeline connection, or the infrastructure improvement plan that Suncor presented to Musket.

## C. Procedural History

In January 2015, Musket filed a lawsuit alleging Suncor breached the Agreement by failing to deliver the agreed upon quantities of crude oil. Suncor answered the complaint and asserted counterclaims against Musket alleging breach of contract for failure to comply with the terms of the Agreement and failure to purchase and receive the agreed upon quantities of crude oil. Musket amended the complaint two more times. Musket expanded its original breach of contract claim into three parts: (1) breach of contract for failure to deliver crude oil; (2) breach of contract for failure to comply with compensation provisions; and (3) breach of contract for failure to comply with confidentiality provisions. Musket also added claims for fraud, fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and punitive damages.

Suncor's counterclaims against Musket allege breach of contract for Musket's failure to purchase or receive the committed volumes of crude oil based upon: (1) Musket's failure to provide sufficient railcars; (2) Musket's failure to ensure the Windsor Terminal could receive the committed volumes of crude oil delivered by Suncor throughout the term of the Agreement; and (3) damages available for the alleged breaches under § S.

Suncor moved to dismiss Musket's claims for fraud, fraudulent inducement, breach of contract for failure to comply with compensation provisions, breach of the implied covenant of good faith and fair dealing, and punitive damages, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The district court denied Suncor's motion regarding Musket's

No. 17-20388

breach of contract claim for failure to comply with the compensation provisions, but granted the motion on the other claims. The fraud claims were the only grounds upon which Musket could claim punitive damages. Accordingly, the district court dismissed Musket's claim for punitive damages.

Following the district court's partial grant of Suncor's motion to dismiss, only Musket's breach of contract claims remained against Suncor. After discovery closed, Suncor moved for summary judgment on the three breach of contract claims. The district court granted summary judgment and dismissed the breach of contract claims for failure to deliver crude oil and failure to comply with the compensation provisions, but denied summary judgment on the claim for failure to comply with the confidentiality provisions.

Musket also moved for summary judgment on Suncor's counterclaims. The district court granted summary judgment and dismissed all of Suncor's counterclaims.

After the district court's rulings on the respective motions for summary judgment, Musket's breach of contract claim for failure to comply with the confidentiality provisions was the only remaining claim in the case. The parties filed a joint stipulation of dismissal of the claim, which the district court granted. This appeal followed.[11]

## II. STANDARDS OF REVIEW

### A. Failure to State a Claim

"We review de novo a district court's grant of a Rule 12(b)(6) motion, 'accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff.'" *Greene v. Greenwood Pub. Sch. Dist.*, 890 F.3d 240, 242 (5th Cir. 2018) (quoting *SGK Props., L.L.C. v. U.S. Bank Nat'l Ass'n*,

---

[11] The district court exercised subject matter jurisdiction over this case based on federal diversity jurisdiction under 28 U.S.C. § 1332. This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

881 F.3d 933, 943 (5th Cir. 2018)). A Rule 12(b)(6) motion may be granted, and the claims dismissed, if a plaintiff fails to allege any set of facts to support the claim that establishes the basis for relief. *U.S. ex rel. Willard v. Humana Health Plan of Texas Inc.*, 336 F.3d 375, 379 (5th Cir. 2003). However, neither conclusory allegations nor "unwarranted deductions of fact," prevent a motion to dismiss from being granted. *Id.* (quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992)).

### B. Dismissal Under Rule 9(b)

Rule 9(b) of the Federal Rules of Civil Procedure requires that a plaintiff state an alleged fraud with particularity. Fed. R. Civ. P. 9(b). "A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)." *U.S. ex rel. Stephenson v. Archer W. Contractors, L.L.C.*, 548 F. App'x 135, 138 (5th Cir. 2013) (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997)). Rule 9(b) requires that a plaintiff state the who, what, when, where, and how of the alleged fraud. *Id.* at 139. "The frequently stated, judicially-created standard for a sufficient fraud complaint . . . instructs a plaintiff to plead the time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 186 (5th Cir. 2009) (internal quotation marks and alteration omitted).

### C. Summary Judgment

We review a district court's grant of summary judgment *de novo*, applying the same standards as the district court. *Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294, 297 (5th Cir. 2017). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam). A dispute is "genuine" when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the nonmoving party. *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (citation omitted). And a fact is "material" if, under the applicable substantive law, "its resolution could affect the outcome of the action." *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (citation omitted).

We must neither weigh the evidence nor evaluate the credibility of witnesses. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). We construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *R & L Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013). But only where both parties have submitted evidence of contradictory facts; we cannot assume, in the absence of proof, that the nonmoving party could or would prove the necessary facts. *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 358 (5th Cir. 2017); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Finally, "[t]he proper interpretation of a contract is a legal determination that is reviewed *de novo*." *ExxonMobil Corp. v. Elec. Reliability Servs., Inc.*, 868 F.3d 408, 415 (5th Cir. 2017).

## III. DISCUSSION

### A. Dismissal of Musket's Fraud Claims

Musket appeals the district court's dismissal of its fraud claims.[12] The district court analyzed Musket's claims under two theories of the alleged fraud.

First, the district court evaluated Musket's allegation that Suncor intentionally misrepresented its capacity to produce and deliver nominated volumes to the Windsor Terminal. The district court dismissed this fraud claim, finding that the claim concerns the nature of the parties' obligations under the Agreement—Suncor agreed to deliver nominated volumes of crude oil to the Windsor Terminal, and Musket agreed to accept the deliveries from Suncor. The district court concluded none of the alleged misrepresentations forming the basis of the claim are "collateral or extraneous" to the Agreement as required under New York law.

Second, the district court evaluated Musket's allegation that Suncor intentionally misrepresented its plans to extend the arrangement with Musket and build pipeline infrastructure to improve the efficiency of deliveries to the Windsor Terminal. The district court concluded Musket failed to plead the claim with particularity as required by Federal Rule of Civil Procedure 9(b). The district court noted the extension conversations began in the spring of 2014 and Suncor requested discounts on payments due for August and September 2014. The district court further noted Musket alleged the discounts were offered in reliance on Suncor's alleged misrepresentations. The district court determined that Musket states the "who, what, where, when, and how" of a proposed infrastructure plan, and the "who, what, and when" of Suncor's request for a discount on Suncor's payment obligations under the Agreement.

---

[12] Musket does not appeal the dismissal of the claims for fraudulent inducement and breach of the implied covenant of good faith and fair dealing. Therefore, we will not evaluate the district court's conclusions regarding those claims.

The district court concluded, however, Musket failed to plead "who, when, where, and how, a conversation, or exchange, took place that would link [the] two separate events together that would indicate fraud by Suncor." The district court dismissed the second fraud claim pursuant to Rule 9(b) explaining, "[w]ithout satisfying the additional pleading requirements of Rule 9(b) it is not plausible to conclude that Suncor knew in the spring of 2014 that it would incur additional obligations under the Master Agreement in August and September of that year and therefore needed to create a 'fraudulent scheme' in order to obtain those discounts."

We agree with the district court and conclude that both of Musket's fraud theories fail to state a plausible claim for relief.

Musket argues the district court erred in dismissing the fraud-based claims as duplicative of Musket's breach of contract claim because the fraud-based claims are separate and distinct from its contract claim, and were pleaded with sufficient particularity. Musket cites several New York state cases and relies on its contentions that, after the Agreement was executed, Suncor: (1) misrepresented its ability to meet the delivery obligations; (2) promised it would take significant, specific steps to increase supply; (3) misrepresented its plans for pipeline infrastructure improvement; and (4) misrepresented its objective of being the exclusive crude oil supplier for the Windsor Terminal beyond the term of the Agreement.

To establish a claim for fraud under New York law, a plaintiff must demonstrate the defendant: (1) knowingly (2) misrepresented a material fact (3) to induce reliance on the fact, and (4) there was justifiable reliance on the fact, from which (5) damages resulted. *Dube-Forman v. D'Agostino*, 877 N.Y.S.2d 740, 741 (2009). However, "[a] cause of action to recover damages for fraud does not lie when the only fraud charged relates to a breach of contract." *Marlowe v. Ferrari of Long Island, Inc.*, 876 N.Y.S.2d 165, 165 (2009). Further,

"a claim for fraud will not be recognized where it is based solely upon the failure to perform the promises of future acts which constitute the contractual obligations themselves." *Microtel Franchise & Dev. Corp. v. Country Inn Hotel*, 923 F. Supp. 415, 417 (W.D.N.Y. 1996) (citing *Chase v. Columbia Nat'l Corp.*, 832 F. Supp. 654, 660 (S.D.N.Y. 1993)).

Even if a plaintiff sufficiently pleads a fraud claim under New York law, the claim is still subject to dismissal if it fails to meet the particularity requirement of Rule 9(b). "State law fraud claims are subject to the heightened pleading requirements of Rule 9(b)." *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 550–51 (5th Cir. 2010) (citing *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 339 (5th Cir. 2008)); *see also Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177 (5th Cir. 1997) ("We see no principled reason why the state claims of fraud should escape the pleading requirements of the federal rules . . . ."). The who, what, when, where, and how of the alleged fraudulent scheme must be pleaded in the complaint.

### 1. *Fraud Related to the Failure to Deliver*

Musket contends the fraud claim related to Suncor's alleged misrepresentations about its capacity to deliver the nominated volumes and its efforts to increase the supply of crude oil to the Windsor Terminal are separate and distinct from Musket's breach of contract claims. These allegations, as articulated in Musket's second amended complaint, state: "Suncor [represented it had] the capacity to meet nominated volumes and Suncor intended to deliver such volumes," and that "Suncor would increase its volumes 'over the coming weeks' . . . in order to satisfy the nominated volumes," along with other similar reassurances.

The district court correctly concluded those allegedly fraudulent representations "concern[] the essence of the parties' obligations under the Master Agreement – Suncor's promise to deliver nominated volumes of crude

oil and Musket's obligation to accept the deliveries." The terms, rights, and obligations outlined throughout the Agreement were designed to initiate and facilitate Suncor's delivery of crude oil to the Windsor Terminal, and this fraud theory is based on representations in furtherance of the same goal.

Musket cites *Kosowsky v. Willard Mountain, Inc.*, 934 N.Y.S.2d 545, 548 (2011), as that court determined that a fraud claim could proceed because the "Plaintiffs [did] not merely allege that defendants falsely represented their intent" with respect to their contractual obligations, but "repeatedly misrepresented or concealed existing facts." *Id.* However, *Kosowsky* also states a "misrepresentation premised directly on the same actions giving rise to a breach of contract does not give rise to a separate cause of action for fraud." *Id.* *Kosowsky* involved fraud claims against a defendant who was not a party to the original contract in the case, and allegations that the defendant had intentionally paid plaintiff less than what was owed under the contract and falsified his companies' annual income reports to correspond with the amounts he had paid. *Id.* In stark contrast, the present case involves alleged misrepresentations that pertain directly to the purpose and nature of the parties' Agreement. *Kosowsky* is unpersuasive. The other cases cited by Musket are also distinguishable and unpersuasive.

The district court correctly dismissed Musket's fraud claim related to Suncor's failure to deliver nominated volumes because the claim is based on promises to do future acts in furtherance of Suncor's obligations under the Agreement. *See Microtel*, 923 F. Supp. at 417. It is unnecessary to consider whether Musket pleaded this claim with sufficient particularity under Rule 9(b) because the fraud allegations fail to state a claim as a matter of law.

### 2. *Fraudulent Scheme to Avoid Compliance with the Payment Terms of the Agreement*

Musket argues the district court erred in concluding Musket's fraud claim

that Suncor concocted a fraudulent scheme, to avoid compliance with its payment obligations, was not pleaded with sufficient particularity. The district court described the allegations forming the basis of the second fraud claim as: (1) "Musket states the conversations took place 'in the spring of 2014' during which Suncor approached Musket about a contract extension and a proposed pipeline plan"; and (2) "Suncor requested a discount on amounts due under the Master Agreement for August and September 2014." The district court further noted, "Musket asserts that 'these discounts were offered in reliance on Suncor's misrepresentations regarding the [future] contract extension and pipeline connection.'" The district court dismissed the second fraud claim after concluding it was not plausible to conclude that Suncor knew in the spring of 2014 that it would incur additional obligations under the Master Agreement in August and September of that year, and therefore needed to create a fraudulent scheme to obtain discounts.

The district court's reasoning is sound. Especially when one considers that Suncor suffered an interruption in July of 2014. Musket attempts to combine its fraud allegations into one theory, listing the details of the fraud allegations point by point. Viewing the alleged facts as true, there is nothing that logically connects the spring 2014 discussions and reassurances to the fall 2014 requests for payment discounts. Musket's argument is more aptly considered as support for a breach of contract theory, not an allegation of a fraudulent scheme existing *before* the interruption and continuing until the fall of 2014. Musket fails to state the second fraud claim with particularity.[13]

---

[13] We affirm the district court's grant of summary judgment on Musket's claim for punitive damages because both fraud claims were properly dismissed. Musket cannot recover punitive damages for the breach of contract claims. *See Rocanova v. Equitable Life Assurance Soc'y of the U.S.*, 83 N.Y.2d 603, 613 (N.Y. 1994) (holding "[p]unitive damages are not recoverable for an ordinary breach of contract").

No. 17-20388

## B. Summary Judgment on Musket's Breach of Contract Claims

Musket appeals the district court's grant of summary judgment on the two breach of contract claims against Suncor.[14] The district court based its conclusions on its interpretation of the Agreement, according to New York law—which governs the contract terms.

Under New York law, when contract language is clear and unambiguous, contracts should be interpreted based on the plain, non-technical meaning of the language of the agreement itself. *Lopez v. Fernandito's Antique, Ltd.*, 760 N.Y.S.2d 140, 141 (2003). Courts must not consider extrinsic evidence to determine the parties' intentions when contract language is clear. *Guggenheim Corp. Funding, LLC v. Access.1 Commc'ns Corp.-NY*, No. 602376/08, 2009 WL 5345767, at *9 (N.Y. Sup. Ct. 2009). "The rules of construction of contracts require [courts] to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." *Black Bull Contracting, LLC v. Indian Harbor Ins. Co.*, 23 N.Y.S.3d 59, 63 (N.Y. App. Div. 2016) (citations omitted). "[T]he entire contract must be reviewed and '[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.'" *Givati v. Air Techniques, Inc.*, 960 N.Y.S.2d 196, 198 (2013) (citations omitted). Where a court can determine the parties' intent from the face of the contract, "interpretation is a matter of law and the case is ripe for summary judgment." *Guggenheim Corp.*, 2009 WL 5345767, at *9 (quoting *Am. Exp. Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (1990)).

---

[14] The district court also granted summary judgement in favor of Suncor on Musket's claim for attorneys' fees, which Musket does not appeal.

15

No. 17-20388

For the reasons that follow, we conclude that the district court correctly granted summary judgment on both breach of contract claims.

1. ***Whether Musket Can Recover Damages for Suncor's Failure to Deliver***

The district court granted Suncor summary judgment on Musket's breach of contract claim for failure to deliver because the district court concluded two contract provisions within § S of the Master Agreement preclude Musket from establishing or recovering damages for the claim. The district court read § S(b) to require Musket to cover—in other words, seek alternative sources of crude oil—when Suncor failed to deliver crude oil. The district court noted that Musket admitted it did not purchase crude oil from other suppliers. The district court rejected Musket's argument that § S(b) does not govern the issue because § S(b) conflicts with the exclusivity provision of the Confirmation, which designates Suncor as the lone supplier of crude oil to the Windsor Terminal during the full term of the Agreement. The district court added, (1) § S(b) does not conflict with the exclusivity provision, and (2) when Suncor failed to deliver crude oil and none of the other provisions of the Confirmation applied, § S(b) applied. The district court concluded Musket was not entitled to damages under § S(b) because Musket did not cover for the failure to deliver.

As additional grounds to support the grant of summary judgment, the district court determined that the measures of damages Musket sought in connection with the claim are barred by § S(a) of the Master Agreement. The district court found that Musket seeks lost profits and other consequential damages. Musket argued § S(a) conflicted with the exclusivity provision in the Confirmation, but the district court considered Musket's argument unpersuasive. The district court read § S(a) as a bar to either party seeking

lost profits or other consequential damages and granted summary judgment in favor of Suncor.

We conclude that the district court properly granted summary judgment on Musket's claim for failure to deliver because § S(a) proscribes the recovery Musket seeks. Musket contends the district court erroneously found that §§ S(a) and S(b) bar Musket from recovering damages for the breach of contract claim for failure to deliver. The district court rejected Musket's argument that the exclusivity clause in the Confirmation renders the entire § S ineffectual because §§ S(b) and S(c) require the parties to cover for failed oil deliveries. Section S(a) does not have a cover requirement, and Musket's only argument against the applicability of § S(a) is the assertion that other subsections of § S conflict with the exclusivity provision.

Section S(a) bars recovery for lost profits and other consequential damages. "It is settled that a contractual provision which limits damages will be enforced unless a special relationship exists between the parties, or a statute or public policy imposes liability despite the restrictions set forth in the contract." *Duane Reade v. 405 Lexington, L.L.C.*, 800 N.Y.S.2d 664, 666 (2005). In the commercial setting, where the language of the damages limitation is clear, courts are not required to "resort to a magnifying glass and lexicon" where no governing statute and no special relationship between the parties would warrant relieving the plaintiff of the contract. *Florence v. Merchants Cent. Alarm Co.*, 51 N.Y.2d 793, 795 (1980).

Section S begins, "*Except as expressly set forth in this Agreement,*" and S(a) states:

> *under no circumstances* will either Party *be liable* to or required to compensate the other Party, in contract, tort, negligence or otherwise, *for any loss of profits*, exemplary incidental, special, contingent, incidental, punitive, *indirect or consequential loss or*

17

No. 17-20388

*damages of any kind*, and the Parties waive their rights thereto including any waiver required under any statutory provision.

(emphasis added). "It is well settled that a breach of contract is compensable by contract damages alone." *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 600 N.Y.S.2d 212, 214 (1993), *aff'd*, 84 N.Y.2d 430 (1994). Under New York law, a plaintiff may plead two types of damages in a contract case: (1) general damages and (2) consequential damages. *PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 370 (S.D.N.Y. 2014). Musket does not dispute that it seeks to recover damages that are barred by § S(a) for the failure to deliver claim. Further, § S(a) is not in conflict with any other section of the Agreement, and Musket has not presented such an argument.

It would be improper for the court to simply ignore § S(a) as Musket suggests. Musket and Suncor do not have a special relationship, nor is there a statute that governs damages in this context. In this contractual dispute involving two sophisticated commercial actors, we interpret § S(a) to have full force and effect, barring Musket's attempt to recover lost profits and consequential damages for a failure to deliver.[15] The practical effect of enforcing § S(a) as it is written is to bar recovery of lost profits and consequential damages for any of the present breach of contract claims.[16]

---

[15] Musket makes several arguments regarding the applicability of § S(b), which is arguably in conflict with the exclusivity provision in the Confirmation. While we disagree with Musket's position, we do not address those arguments because § S(a) is not in conflict with any other provision of the Agreement and should be read to have full force and effect under New York law.

[16] We note that Musket has neither sought nor presented any arguments regarding general damages.

No. 17-20388

## 2. *Whether Musket Can Invoke Alternative #2 to Recover Damages from Suncor*

The district court granted Suncor summary judgment on Musket's breach of contract claims for failure to comply with compensation provisions Alternative #1 and Alternative #2 of the Agreement. Those provisions describe specific conditions under which Suncor would compensate Musket for failure to deliver nominated volumes of crude oil set forth in the Agreement. Musket appeals only the district court's grant of summary judgment on Musket's claim that Suncor failed to comply with Alternative #2.[17] Reading the language of Alternative #2 and the Agreement as a whole, the district court determined there were two conditions precedent before Alternative #2 could be applied. The district court found that Musket and Suncor must have (1) exhausted reasonable commercial efforts, and (2) still been unable to identify a profitable market for a given committed volume. The decision to grant summary judgment was based on the district court's conclusion that Musket failed to provide sufficient evidence that the parties were unable to identify a profitable market.

The district court rejected Musket's argument that the court should have presumed the parties were unable to identify a profitable market on given committed volumes or Suncor would have delivered the entire committed volumes to Musket. The district court found Musket's position unpersuasive because, while there must have been a market-based reason for the parties' decision to agree on the delivery of fewer barrels than the committed volume stated in the Agreement each month, Musket must provide sufficient *evidence* indicating there is an issue of material fact that both parties exhausted

---

[17] Musket does not appeal the grant of summary judgment on the claim for failure to comply with Alternative #1.

19

reasonable commercial efforts *and* were unable to identify a profitable market for a specific committed volume. As evidence that both conditions precedent were met, Musket provided statements from a Musket managing director and vice president, who testified that the parties could not locate a profitable market for the full committed volumes for almost every month of the Agreement, and could not identify a profitable market for the committed volumes Suncor did not deliver. The district court found those statements conclusory and granted summary judgment in Suncor's favor.

We agree with the district court and conclude that Musket has failed to provide evidence that the parties met the conditions precedent to create obligations under Alternative #2. Alternative #2 of the Confirmation states in relevant part:

> Alternative #2: Procedure if Parties are unable to identify a Profitable Market
> *If* after exhausting reasonable commercial efforts *the Parties* are unable to identify a profitable market for a given Committed Volume *then* this Alternative #2 applies:
> Seller shall:
> (i) be relieved of its obligation to physically deliver the applicable Committed Volume to Buyer; and
> (ii) instead of physical settlement of the applicable Committed Volume, there will be deemed delivery to Buyer of the applicable Committed Volume, and Seller will pay Buyer $2.50 per barrel associated with the said Committed Volume. The foregoing forms the basis for the *take or pay scenario* insofar as Seller is committed to delivering a Committed Volume pursuant to this Transaction.

(emphasis added).[18] Based on a plain reading of the provision, to trigger Alternative #2, the parties must have exhausted reasonable commercial efforts

---

[18] We note that Musket seeks liquidated damages for its failure to comply claim. The Agreement does not expressly bar recovery for liquidated damages. Moreover, § S of the Master Agreement creates exceptions to § S(a)'s general bar on consequential damages for those "expressly set forth in this Agreement." Therefore, liquidated damages are recoverable under the Agreement. "Whether a contractual provision represents an enforceable liquidated damages provision or an unenforceable penalty is a question of law." *United Title Agency, LLC v. Surfside-*

and still failed to identify a profitable market for a given Committed Volume. Musket asserts that the district court "added" the reasonable commercial efforts requirement. Musket's assertion is unpersuasive because the plain "if" and "then" language of the provision creates two conditions precedent that must be met before Alternative #2 can apply. *See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 691 (1995) ("[T]he . . . agreement unambiguously establishes an express condition precedent rather than a promise, as the parties employed the unmistakable language of condition ('if,' 'unless and until').").

Musket contends Alternative #2 is a "take or pay" scenario for Musket, which is proof the parties did not have to work together before Alternative #2 could be invoked. In addition, Musket asserts Alternative #2 could be invoked anytime Suncor unilaterally failed to deliver a full committed volume. Musket essentially argues Suncor's failure to deliver alone is proof there was no profitable market at a given time. According to Musket, Suncor is required to pay the Alternative #2 fees anytime it fails to deliver a full committed volume as contemplated by the Agreement. As evidence to support its theory, Musket relies on the testimony of its managing director and vice president, who articulated the thinking underlying Musket's profitable market argument. The

*3 Marina, Inc.*, 885 N.Y.S.2d 334, 335 (2009). Parties to an agreement have the right to contract for liquidated damages unless the clause is unconscionable or contrary to public policy. *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 423–24 (1977). Suncor has not presented such arguments. Read liberally, Alternative #2 contemplates liquidated damages when the provision applies. *See id.* ("Liquidated damages constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract."). Although the provision does not expressly use the word damages, subsection (ii) entitles Musket to $2.50 per barrel for Suncor's breach of the provision. *See id.* ("[A] liquidated damages provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement."). Because we conclude that Musket did not meet the conditions precedent to trigger payment under Alternative #2, we do not address whether Musket could be entitled to liquidated damages.

district court noted that Musket submitted some evidence that *Suncor* was unable to identify a profitable market for deliveries, but not evidence that *both* parties failed to identify a profitable market after exercising reasonable commercial efforts.

We also disagree with Musket's presumption theory. There must be evidence indicating there is an issue of material fact that *both* parties exhausted commercially reasonable efforts *and* were still unable to identify a profitable market before the court could apply Alternative #2. Musket has not provided such evidence, and its reliance on conclusory statements is insufficient.

Accordingly, we affirm the district court's grant of summary judgment on Musket's breach of contract claim for failure to comply with the compensation provisions.[19]

## C. Summary Judgment on Suncor's Breach of Contract Counterclaims

Suncor appeals the district court's grant of summary judgment on its breach of contract counterclaims against Musket for failure to purchase and receive the nominated volumes of crude oil.[20] The district court granted

---

[19] In addition to granting summary judgment on Musket's breach of contract claims on the grounds previously stated, the district court determined, in the alternative, Suncor was entitled to partial summary judgment on the breach of contract claims related to delivery deficiencies because Musket failed to provide written notice of the deficiency claims as § S of the Master Agreement requires. On appeal, Musket argues, in part, it consistently provided Suncor with updates on the volumes of barrels of crude oil delivered to Musket, which should have made Suncor aware it was not complying with the Master Agreement. While we agree with the conclusion reached by the district court—that notice of deficiencies is not equivalent to notice of *claims* against Suncor for those deficiencies—we need not elaborate on this alternative ground. The grant of summary judgment on Musket's breach of contract claims was proper.

[20] The district court granted summary judgment in favor of Musket on all of Suncor's counterclaims. The district court did not address Suncor's request for attorneys' fees and Suncor makes no argument regarding the request for attorneys' fees on cross-appeal.

No. 17-20388

summary judgment regarding Suncor's counterclaims on three separate grounds.

We conclude the district court was correct in granting summary judgment on Suncor's counterclaims against Musket, albeit for reasons that differ from the district court regarding one of the grounds for dismissal.

### 1. *Whether Suncor Can Recover Damages for Musket's Failure to Provide Sufficient Railcars at the Windsor Terminal*

First, the district court determined paragraph (ii) of the additional provisions section of the Confirmation applied to Suncor's breach of contract counterclaim for Musket's failure to provide sufficient railcars, and found the claim required proof of a mutual agreement on the Alternative Buyer/Delivery Point as defined in the Confirmation. The district court concluded Suncor failed to raise a genuine issue of material fact to establish the existence of such a mutual agreement and granted Musket summary judgment on the claim.

We agree. Paragraph (ii) of the additional provisions states:

> *If* Buyer's failure to provide rail cars, as averaged *over three (3) consecutive months*, unreasonably interferes with Seller's ability to ratably deliver Product to the Windsor Terminal causing Seller to deliver to *Alternate Buyer/Delivery Point*, *then* Buyer agrees to pay Seller $1.50 for each barrel associated with the said three (3) month period that Seller delivered to such Alternate Buyer/Delivery Point.

(emphasis added).[21] The district court noted that the court had to determine whether the "Alternate Buyer/Delivery Point" required mutual agreement before the court could consider any evidence of such an agreement. Suncor

---

[21] As an initial matter, this provision contemplates liquidated damages when paragraph (ii) applies. *See supra* note 17; *see also Truck Rent-A-Ctr.*, 41 N.Y.2d at 423–24 ("Liquidated damages constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract."). We conclude that Suncor did not meet the conditions precedent to trigger payment under paragraph (ii). Therefore, we do not address whether Suncor could be entitled to liquidated damages.

23

argues that the district court's determination was based on an incorrect interpretation of the Agreement, and nevertheless, Suncor presented more than enough evidence to establish a genuine issue of fact that the parties did reach a mutual agreement for delivery to at least one of three alternative buyer points. Suncor's underlying contention is that the district court applied an incorrect definition to "Alternative Buyer/Delivery Point."

The definition of "Alternate Buyer/Delivery Point" is unambiguous when one considers the Agreement in its entirety. There is no definitions section in the Confirmation, however, "Alternative Buyer/Delivery Point" appears in paragraph (ii) and in Alternative #1. The term is capitalized and in bold the first time it appears, in Alternative #1. The provision states:

> Seller is relieved of its obligation to sell such applicable Committed Volume to Buyer and may sell the applicable Committed Volume directly to a third party and at a mutually agreed upon alternate delivery point **("Alternate Buyer/Delivery Point")**; provided that, Seller will reimburse Buyer for all of its direct cost associated with Buyer's operation of the Windsor Terminal, including freight, terminal fees, rail car leases at the rate of $1,200.00 (per rail car per month) plus a $2.75 per barrel fee.

In the district court, Musket argued that the definition is "a third party and at a mutually agreed upon alternate delivery point." Suncor argued that the "mutually agreed upon" portion of that phrase does not make sense—basically asserting that "Alternate Buyer/Delivery Point" means "a different buyer and delivery point." Considering how terms are defined throughout the Agreement, Suncor's definition is incorrect.

When considering whether a contract term "is unambiguous, language should not be read in isolation because the contract must be considered as a whole." *NRT New York, LLC v. Harding*, 16 N.Y.S.3d 255, 258 (N.Y. App. Div. 2015) (citations omitted). "If the language of the contract is susceptible of more

than one reasonable interpretation, the contract will be considered ambiguous." *Id.* The question of whether a contract—and its terms—is unambiguous, is a question of law. *Id.* A court should not allow extrinsic and parol evidence of the parties' intent to be admitted when the contract is unambiguous on its face. *Id.*

Throughout the Agreement, important terms—such as "Term", "Committed Volumes," and "Windsor Terminal"—are bold and capitalized the first time the term appears, signaling that the terms are defined terms of the Agreement when they first appear. The same is true of the "Alternate Buyer/Delivery Point." As the district court noted, if these sophisticated parties wanted the term to have a different definition in paragraph (ii), they would have used a different uncapitalized and nonbold term in each paragraph.

We agree with the district court's conclusion that, in entering the Agreement, Suncor agreed to obtain a mutual agreement before diverting its crude oil to another delivery point when Musket could not receive the full shipment; as the definition of "Alternate Buyer/Delivery Point' expressly states in Alternative #1. We now turn to Suncor's contention that it provided sufficient evidence of mutual agreement to survive summary judgment.

Suncor provides evidence that it delivered crude oil that Musket could not receive to three alternate buyers or delivery points. Suncor directs this court to a declaration made by its crude oil trader stating that Musket never prohibited Suncor from unilaterally delivering barrels of crude oil to the alternate points when the Windsor Terminal could not take the barrels. Suncor also presents strings of emails—transmitted during December 2013; February 2014; April 2014; May 2014; June 2014; and February 2015—that highlight a host of problems with capacity at the Windsor Terminal and that indicate Musket would turn trucks away after the terminal reached capacity. The

emails also indicate that Suncor employees had internal discussions about diverting barrels of crude oil to at least three other locations. There are also emails that indicate at least one Musket employee knew of at least one of the alternate delivery points used by Suncor.

The evidence provided by Suncor does not raise an issue of material fact as to whether there was a problem with the railcars at the Windsor Terminal for a period of three months that caused both parties to agree on alternate buyers at alternate delivery points during that period. At most, the evidence indicates that such an agreement existed on at least one day for at least one shipment. The evidence is insufficient to create a genuine issue of material fact that an agreement existed to trigger the obligations of paragraph (ii).

The district court was correct in granting summary judgment on the breach of contract counterclaim for failure to provide sufficient railcars.

### 2. *Whether Suncor Can Recover Damages for Musket's Failure to Receive*

Second, the district court concluded that the Agreement does not support Suncor's general breach of contract counterclaim seeking damages under § S. Because Suncor seeks lost profits or consequential damages for the general breach of contract counterclaim, we agree.

Suncor requests "actual damages" as recovery for the breach of contract counterclaims. However—as stated previously—under New York law, a party may plead two types of damages in a contract case: (1) general damages and (2) consequential damages. *PNC Bank, Nat. Ass'n v. Wolters Kluwer Fin. Servs., Inc.*, 73 F. Supp. 3d 358, 370 (S.D.N.Y. 2014). A party alleging breach of contract is not required to specifically plead general damages, as those damages directly flow from and are considered the "natural and probable" consequence of the alleged breach. *See Bi-Econ. Mkt., Inc. v. Harleysville Ins.*

26

No. 17-20388

*Co. of New York*, 10 N.Y.3d 187, 192 (2008) ("[T]he nonbreaching party may recover general damages which are the natural and probable consequence of the breach."); *see also Keefe v. Lee*, 197 N.Y. 68, 71 (1909) (noting a plaintiff "may recover such damages as necessarily, usually and immediately flow [from injury], under a general allegation in the complaint that damages have been sustained by him by reason of such injury"). Conversely, consequential damages must be alleged. *Vista Food Exch., Inc. v. BenefitMall*, 31 N.Y.S.3d 9, 11 (N.Y. App. Div.), *leave to appeal denied*, 28 N.Y.3d 902 (2016).

The district court determined that the Agreement does not support Suncor's general claim for damages outside of the provisions of paragraph (ii) and paragraph (iii) of the Confirmation, without addressing Suncor's failure to specify its claim for damages. On appeal, Suncor argues that its general breach of contract counterclaim for Musket's alleged failure to purchase and receive nominated volumes of crude oil is "essentially the mirror image" of Musket's breach of contract claim against Suncor for failure to deliver. Despite this acknowledgment, Suncor contends § S(a) of the Master Agreement unambiguously prevents recovery of the sought after damages for all the breach of contract claims related to the delivery and receipt of nominated volumes of crude oil shipments. Further, Suncor contends that it would be inconsistent for this court to allow one of the claims to remain while affirming the dismissal of the other. We interpret the arguments presented by Suncor as a concession that it too is seeking lost profits and other consequential damages for its general breach of contract counterclaim. Accordingly, we conclude that § S(a) bars recovery for Suncor's breach of contract counterclaim for lost profits and other consequential damages in this case.[22]

---

[22] As acknowledged above, general damages are assumed to flow naturally from an alleged breach of contract. Because neither party has presented arguments regarding general damages related to the breach of contract claims for failure to deliver and failure to receive,

We affirm the grant of summary judgment on Suncor's general breach of contract counterclaim for Musket's failure to purchase and receive the nominated volumes of crude oil.

### 3. *Whether Suncor Can Recover Damages for Musket's Failure to Receive Because the Windsor Terminal Lacked Sufficient Capacity*

Finally, the district court determined that paragraph (iii) of the additional provisions applied to the counterclaim for failure to ensure the Windsor Terminal had sufficient capacity to receive the nominated volumes of crude oil and found that counterclaim required proof Musket failed to use reasonable commercial efforts in attempting to comply with its obligations regarding the Windsor Terminal. The district court concluded Suncor failed to present evidence Musket did not use reasonable commercial efforts and granted summary judgment on the counterclaim in favor of Musket.[23]

For reasons that differ from the district court's, we affirm. Suncor's counterclaim for Musket's failure to maintain and expand the Windsor Terminal seeks damages under § S in connection with Musket's failure to purchase and receive the committed volumes of crude oil. Therefore, the Agreement does not support Suncor's request for damages on that counterclaim.

Under the terms of the Confirmation, Suncor's remedy for deficiencies related to the capacity and expansion of the Windsor Terminal was contract termination. As much is stated in the provision discussing expansion of the terminal and the additional provisions. The district court also acknowledged

---

any arguments addressing general damages are waived. *See Sama v. Hannigan*, 669 F.3d 585, 589 n.5 (5th Cir. 2012) (noting that issues not argued on appeal are waived).

[23] The district court granted summary judgment in favor of Musket on all of Suncor's counterclaims. The district court did not address Suncor's request for attorneys' fees and Suncor makes no argument regarding the request for attorneys' fees on cross-appeal.

that the Agreement granted Suncor the right to terminate the Agreement for any reason if Musket did not meet its obligations regarding the Windsor Terminal. Significantly, the Confirmation states that Suncor's right to terminate the contract would not limit "its rights and remedies" under the Agreement.

During the district court proceedings, Suncor described its counterclaim related to the Windsor Terminal as a claim against Musket "for breach of the Agreement based on Paragraph (iii) of the Additional Provisions and Musket's liability under § S." Suncor further stated that "[t]hese provisions deal with Musket's obligation to purchase the crude oil sold by Suncor and to make the Windsor Terminal capable of ratably receiving the agreed-upon volumes of crude oil." The district court interpreted Suncor's explanation to mean that Suncor alleged breaches of paragraph (ii) and (iii) and damages available for the alleged breach of paragraph (iii) under § S. Later, in response to Musket's argument that Suncor did not have evidence that Musket failed to use "reasonable commercial efforts" as required by paragraph (iii), Suncor argued that its counterclaim was not limited by the "reasonable commercial efforts" clause because the Agreement required Musket to receive the nominated volumes and expand the Windsor Terminal to be able to receive the nominated volumes. The district court determined that Suncor failed to show an issue of material fact that Musket did not use reasonable commercial efforts in ensuring the Windsor Terminal had sufficient capacity to receive the nominated volumes of crude oil.

The district court did not need to evaluate whether Musket used reasonable commercial efforts to comply with paragraph (iii) because § S does not provide the damages remedy Suncor seeks for the alleged breach. A plain reading of the Agreement indicates that the parties did not contemplate damages under § S for a failure to maintain or expand the Windsor Terminal.

Section S only authorizes damages for Musket's failure to purchase or receive the committed volumes under § S(c). That section contains a cover requirement—authorizing damages in an amount equal to the positive difference between the amount Musket would have paid under the Agreement for a non-purchased volume (referred to as "Quantity" in the Agreement) and the amount Suncor received in covering the non-purchased volume by selling to a third party. That amount would be the only damages that would naturally flow from Musket's alleged breach and Suncor has not presented that claim for damages at any stage in this case.

Therefore, despite the attempt to disguise its counterclaim, Suncor seeks damages outside the scope of § S(c) as a remedy for the alleged breach of paragraph (iii). There has been no evidence provided to indicate the sophisticated parties in this case contemplated the damages Suncor seeks. Since lost profits and other consequential damages are barred by § S(a), Suncor has not presented a valid damages claim for Musket's alleged failure to ensure the Windsor Terminal had sufficient capacity to receive the nominated volumes of crude oil.

We affirm the district court's grant of summary judgment on other grounds.

## IV. CONCLUSION

For the reasons stated above, the district court's partial grant of Suncor's motion to dismiss is AFFIRMED, the district court's partial grant of Suncor's motion for summary judgment is AFFIRMED, and the district court's grant of Musket's motion for summary judgment is AFFIRMED.